**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1904

September Term, 2013
_____

BALTIMORE COUNTY, MARYLAND

v.

BALTIMORE COUNTY FRATERNAL
ORDER OF POLICE, LODGE NO. 4

_____

No. 099

September Term, 2014
_____

BALTIMORE COUNTY, MARYLAND

v.

BALTIMORE COUNTY FRATERNAL
ORDER OF POLICE, LODGE NO. 4

_____

Meredith,
Wright,
Hotten,
        JJ.

_____

Opinion by Meredith, J.

_____

Filed: December 17, 2014

Baltimore County, appellant, mounts a variety of challenges to an arbitration award regarding retirement benefits that was issued in 2008, affirmed in 2010 by the Circuit Court for Baltimore County, and ultimately affirmed again in 2012 by the Court of Appeals in *FOP Lodge No. 4 v. Baltimore Co.*, 429 Md. 533 (2012), *reconsideration denied*, 429 Md. 533 (2013). Although the County contends that it is not appealing the arbitration award itself, but rather its enforceability, that contention is undermined by the arguments the County makes. In the rulings which led to the present consolidated appeals, the Circuit Court for Baltimore County held that, in accordance with the law of the case doctrine, the County was required to comply with the previously confirmed arbitration award. Under protest, the County did pay the amount due as a result of the arbitration award, but continues to challenge the enforceability of the award.

## QUESTIONS PRESENTED

The County presented nine questions for our review, the majority of which had already been raised in proceedings prior to the previous appeal. The primary focus of the current appeal is:

Did the trial court correctly apply the law of the case doctrine?[1]

---

[1] The following are the County's questions presented:

1. Whether the arbitration award was unenforceable because there has never been an appropriation by the County Council to pay for the reset of the rates or for the 'make whole' relief granted in that award?

2. Whether the arbitration award was unenforceable because the County Council never enacted a budget containing funds for a reset or for make whole relief; instead it enacted FY 2008-2015 budgets which contained

For the reasons that follow, we affirm the judgments of the Circuit Court for Baltimore County.

---

the reduced subsidies negotiated by the Health Care Review Committee, and the Circuit Court was bound to respect those enactments as the only contract between FOP and the County?

3.    Whether public policy, as clearly expressed in the Baltimore County Charter, the Baltimore County Code, and controlling Maryland case law, provides an exception to the enforcement of the arbitration award in this case?

4.    Whether the Show Cause Order threatening incarceration was an unconstitutional exercise of judicial power calculated to coerce an appropriation or illegal payments in violation of the separation of powers doctrine?

5.    Whether the arbitration award is unenforceable because the original grievance was not timely filed and the issue of the effect of that lack of timeliness on the arbitration award has never been resolved?

6.    Whether the arbitration award is unenforceable as FOP's grievance was invalid on its face, because under the MOU 'retirees' are not 'employees' entitled to bring any kind of grievance?

7.    Whether the Circuit Court's award of injunctive relief and damages to FOP was clearly erroneous, because FOP did not sustain any harm or damages as a result of the reduced subsidy rates?

8.    Whether the Circuit Court's refusal to allow the County's witnesses to give any substantive testimony was clearly erroneous?

9.    Whether FOP was entitled to prejudgment interest?

As will be explained in this opinion, five of these questions (1, 2, 3, 5, and 6) have already been decided against the County in earlier decisions. We answer questions 7 and 8 in the negative, and we answer question 9 in the affirmative. Because question 4 is now moot, we decline to rule on the question.

2

## FACTS AND PROCEDURAL HISTORY

This case has its roots in a grievance filed in 2007, although the backdrop to that grievance extends back to 1991. Appellee, FOP Lodge No. 4 ("appellee" or "FOP"), is the exclusive bargaining agent for the Baltimore County Police Department. Periodically, the FOP and the County negotiate a Memorandum of Understanding ("MOU") setting forth each party's rights and obligations. In 1991, owing to what the County has characterized as a bad economic climate, the County offered its eligible employees a retirement incentive program; among the County employees to whom it applied were FOP members. The retirement incentive program provided that eligible officers who retired on or before January 31, 1992, were guaranteed a 90/10 health-insurance subsidy split; that is, it was guaranteed to those retirees that the County would pay 90% of their health-insurance premium, and the retiree would pay 10%.

The County notified those employees who did not take advantage of that incentive program that the health insurance split would be as follows: "An individual who retires on or after February 1, 1992, with 30 or more years of creditable service will receive the same subsidy as an active employee and that subsidy may go up or down as a result of labor negotiations[.]" But, as part of the negotiations for the 1996 MOU, which took effect on July 1, 1995, the FOP and the County agreed that an 85/15 split would apply retroactively to those officers who retired between February 1, 1992, and July 1, 1995; they were, at that time, "locked in." The specific language that "locked in" this split stated: "The health insurance

3

subsidy in place at the time of retirement shall remain in effect until the retiree becomes eligible for Medicare." It was the FOP's position that the practical effect of this provision was to guarantee an 85/15 subsidy split to those retirees.

This arrangement was repeated in subsequent MOUs without dispute until the "2008 MOU" that would become effective July 1, 2007, and run through June 30, 2008. During negotiations about that MOU, the County, citing runaway health-care costs, informed the FOP that it intended eventually to move to an 80/20 split, with a one-percent decrease in the County's contribution to take effect each year in five successive years. The County proposed to change the benefit to an 84/16 split in 2008, followed by an 83/17 split in 2009, and so on. The FOP voted against this change, but it was nevertheless accepted by the Health Care Review Committee, the official bargaining agent as to healthcare issues for several unions for County employees, including the FOP. The County applied the less favorable split to all retirees, including those who had retired when there were MOUs in effect which included language the FOP considered a lock in of benefits.

Pursuant to the procedures outlined in the relevant MOU, FOP filed a grievance against the County, alleging that the proposed downward adjustment of the health-care subsidy violated Section 7.3(a) and (c) of the 2007 MOU.[2] The grievance was denied by the

---

[2] Section 7.3 of the July 1, 2006-June 30, 2007 MOU ("2007 MOU") provided, in relevant part:

> **Section 7.3(a)-Health Care Coverage**
> Medical Plans. The County shall provide employees and retirees not eligible for Medicare with a Triple Option Medical Plan. Effective September 1, 2003,

4

Baltimore County will convert prior HCP and POS plans into the said Triple Option plan.  The plan design shall be as follows. . . [chart omitted].

The Triple Option Plan shall be available as an option to all active employees, all retirees not eligible for Medicare, and their eligible dependents.

The County shall provide at least two (2) Health Maintenance Organization Plans (HMOs).  These plans will also be available as an option to all active employees, all retirees not eligible for Medicare, and their eligible dependents. Subsidy.  The County shall contribute 85% of the premium cost for the Triple Option Plan.  Active Employees will pay 15% of the premium cost.  Retirees not eligible for Medicare will receive a subsidy based on the amount of creditable service and consistent with County policy in force at the time of retirement.

\* \* \*

**Section 7.3(c)-Retiree Health Insurance**
The County shall provide the same health insurance benefit plans offered to active employees for retirees not eligible for Medicare who attain sufficient creditable service for a full retirement within their bargaining unit, or retirees who qualify for disability retirement.  The County will contribute toward the premiums for available benefit plans consistent with County policy in force at the time of retirement. **The health insurance subsidy in place at the time of retirement shall remain in effect until the retiree becomes eligible for Medicare.**  Upon reaching eligibility for Medicare, County retirees are required to enroll in both part A and part B of Medicare in order to enroll in the County's Medicare Supplemental Plan.  The County subsidy for the Medicare Supplemental Plan is 75% of the plan premium.

County retirees who would otherwise reach Medicare eligibility age, but who do not qualify on their own or through a spouse for Medicare coverage, will be allowed to remain in the County health plans offered to non-Medicare retirees.  Upon reaching Medicare eligibility age, the County subsidy will be 75% of the premium cost for the medical plan.  Continuation of managed dental and vision coverage after reaching Medicare eligibility age is available only under the terms and conditions of Federal COBRA laws."

5

Labor Commissioner on November 6, 2007; the Labor Commissioner concluded that, because FOP was complaining about a violation of Section 7.3 of the 2007 MOU, and that MOU expired on June 30, 2007, those sections were "no longer controlling," and the County could not have violated them.

FOP then demanded arbitration pursuant to the dispute-resolution provision of the MOU. On May 9, 2008, Arbitrator Richard Bloch, Esquire, conducted a hearing. One of the arguments made by the County was that the grievance had not been timely filed because it was not filed within ten workdays after the 2007 MOU's expiration on July 1, 2007. Rather, the grievance was filed on September 14, 2007, which was within ten workdays of September 1, 2007, the date on which the County's new 84/16 split began to be reflected in the retirees' health-insurance premiums. The main argument made by the County, however, was that there was nothing left to either grieve or arbitrate relating to the now-expired 2007 MOU. In his decision, Arbitrator Bloch rejected both of these contentions. Because the arbitrator's findings have been affirmed in subsequent proceedings, and, we will hold, remain binding, we will quote from them extensively:

> During 1995 negotiations for a new collective bargaining agreement, the Union successfully negotiated a health insurance provision that locked in the subsidy in effect at the time of retirement until the retiree reached age 65. Moreover, the parties agreed to apply that benefit retroactively to officers who retired between February 1, 1992 and July 1, 1995, the effective date of the new Memorandum of Agreement (hereinafter "MOU"). Section 7.13 of the MOU stated, in relevant part:

(Emphasis added.)

6

Section 7.13: Retiree Health Insurance-The County shall provide the same health insurance benefits (programs and contributions) for retirees under the age of sixty-five (65) as it does for active employees, at the time the employees retires (sic). The health insurance subsidy at the time of retirement will remain in effect until the retiree or the retiree's surviving beneficiary reaches age sixty-five (65).

Effective July 1, 1995, retirees who retired on or after February 1, 1992 shall receive the County contribution for health insurance as set forth above.[FN 3 OMITTED]

As structured, this language had a two-fold impact. The first paragraph provided the "lock" for the subsidy in effect at the time of an officer's retirement. The second paragraph ensured that officers who retired between February 1, 1992 and July 1, 1995 would receive the same guarantee with respect to the rate existing at their times of retirement. The language remained in subsequent MOUs until 2003-2004. [FN 4 OMITTED] The sole change at that time, however, related to removal of the sentence providing that "Effective July 1, 1995, retirees who retired on or after February 1, 1992 shall receive the County contribution for health insurance as set forth above." (The parties did not then see that as a substantive change and do not claim here that it has any impact on the current dispute.) The critical lock-in language — "The health insurance subsidy in place at the time of retirement shall remain in effect until the retiree becomes eligible for Medicare" remained unchanged in the MOUs effective in 2004-2005, 200[ ]5-2006 and 2006-2007. [FN 5: "During those periods of time, the contribution split remained at 85/15."]

The dispute in this case centers on changes applicable to the July 1, 2007 - June 30, 2008 MOU. In negotiations preceding the agreement, the County proposed the following language:

E. Retiree Health Insurance. The County shall provide the same health insurance benefit plans offered to active employees for retirees not eligible for Medicare who attain sufficient creditable service for a retirement within their bargaining unit, or retirees who qualify for disability retirement. The County will contribute toward the premium for available benefit plans in accordance with the Administrative Officer's Policy, on Insurance

7

Benefits for Baltimore County retirees. Employees who retire from county service shall have the subsidy provided for in Exhibit (I). [FN 6 OMITTED]

For all negotiations after 1995, the FOP, and other County unions, as well as a non-Union employee group, were represented (for health care issues) by a group known as the Health[care] Review Committee ("HRC"). [FN 7 OMITTED] That Committee initially objected to the County's proposed revised language, specifically the removal of the "lock-in" terms. [FN 8 OMITTED] Nevertheless, the HRC agreed to the modified health insurance package. Ultimately, the final proposal from the County on retiree health insurance read as follows:

> E. Retire[e] Health Insurance
> "The County shall provide the same health insurance benefit plans offered to active employees for retirees not eligible for Medicare who attain sufficient creditable service for a retirement within their bargaining unit, or retirees who qualify for disability retirement: Individuals who retired prior to July 1, 2007 who are Medicare eligible the County Subsidy for the Medicare Supplemental Plan is 75% of the plan premium. The County will contribute toward the premium for available benefit plans in accordance with the County Policy, on Insurance Benefits for Baltimore County retirees. Employees who retiree (sic) from county service shall have the subsidy provided for in Exhibit I."

Pursuant to the existing process, each union brought the health insurance package to its membership for separate votes. The FOP membership, for its part, rejected the health insurance package. On September 7, 2007, the County moved to increase the retiree health insurance premium split. [FN 9 OMITTED]

The FOP claims, in this arbitration, that the rejected portion of the health benefits package is not effective, as a result of its not having been ratified. Moreover, it contends the promises made during prior MOUs to retirees were in the nature of vested benefits and not only were not removed by the 2007 negotiations, but could not have been removed. Members covered by that language, it says, must continue to have health benefit subsidies remain at the level in effect at their retirement until they reach 65.

8

**Issue**

**Do officers who retired on or after February 1, 1992 and before July 1, 2007 have a vested right to retain the health insurance premium split applicable to active officers as of the time of their retirement?** [FN 10 OMITTED]

FOP Position

The FOP claims the promises made beginning in 1995 continue to be fully binding on the County. The right to lock in benefit splits at the levels in effect upon retirement is vested, says the FOP, and cannot be changed with respect to those employees. **It requests the County be directed to: (1) rescind the modification to the premium split for such retirees, (2) reset the contribution split to the 85/15 level and (3) direct that the County shall not implement other scheduled changes to the premium split. It also requests that the County be ordered to make retirees whole for the increased premium amounts improperly charged to them since September 1, 2007.**

County Position

The County claims the grievance is not arbitrable. The grievance itself was filed September 14, 2007, based on language in the FY 2007 MOU. But, says the County, the previous MOU expired June 30, 2007. Any rights existing thereunder were thereby extinguished. Moreover, says the County, the MOU makes the grievance procedure applicable to "all employees." The MOU defines an "employee" as "all sworn personnel up to and including the rank of lieutenant of the police department." Since retirees are not "employees", the FOP has no contractual right to grieve on their behalf. It requests that the grievance be denied.

Analysis

For the reasons that follow, the finding is this grievance has merit. Central to the County's rebuttal to the grievance, and its claim that the grievance is not arbitrable, is its contention that the 2007 MOU, on which the FOP's grievance is premised, has expired. In the absence of any statutory foundation for healthcare benefits [FN 11 OMITTED] since the grievance was filed some three months after expiration of the 2007 agreement, says the

9

County, the benefit expired and, with it, the arbitrator's authority to enforce the labor agreement.

The end of a labor contract, however, does not always signal the death of negotiated rights thereunder, including the right to have a dispute over that matter resolved through arbitration. That principle was decided by the United States Supreme Court in *Nolde Brothers, Inc. v. AFL-CIO* [(430 U.S. 243 (1977) (FN 12 OMITTED)]. . . .

. . . [T]he Supreme Court held the grievance in that case did, in fact, survive the contract termination. . . . Concluding, finally, that national labor policy has established a strong presumption in favor of arbitrability [FN 16 OMITTED] the Court affirmed the arbitrability of the matter.

In *Litton v. National Labor Relations Board, et al.* [*Litton Financial Printing Division, a Division of Litton Business Systems, Inc., Petitioner v. National Labor Relations Board, et al.*, 501 U.S. 190 (1991)][FN 17 OMITTED], the Supreme Court took the opportunity to expand on the *Nolde* principles. It reiterated that the obligation to arbitrate disputes over post-expiration contract terms is by no means unlimited. An expired collective bargaining agreement, noted the Court, is no longer a legally enforceable document. [FN 18 OMITTED] But the Court highlighted an exception, significant here, in cases involving "obligations already fixed under the contract but as yet unsatisfied." [(501 U.S. 190 at 197) (FN 19 OMITTED)]

> The *Nolde Brothers* presumption is limited to disputes arising under the contract. A postexpiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

[(501 U.S. 190 at 205-06.)]

\* \* \*

In this case, the ultimate question is whether the retiree rights at issue may be considered vested and thus capable of continuing enforcement. There

10

is, in this case, a companion issue, however, that raises the question of whether the retiree rights were terminated through bargaining by the FOP's designated bargaining agent, the Health[care] Review Committee. This opinion turns now to both those issues.

As noted earlier, the HRC, while initially protesting the removal of the "lock-in" language, ultimately agreed to management's proposed change. But this, one concludes, did not result in the FOP's forfeiting the rights at issue. [FN 21 OMITTED] According to the record, the FOP rejected the health insurance package proposed by the County. [FN 22 OMITTED] The County directs the arbitrator's attention to the decision of Arbitrator M. David Vaughan, who concluded, in January of 2008, that the County did not engage in an unfair labor practice by refusing to negotiate further with the FOP after it rejected the County's proposed language changes. Vaughan concluded, among other things, that the Health[care] Review Committee was the authorized representative of the Unions, including the FOP, and that there was no provision, contractually or statutorily, for a dissenting unit to demand additional negotiations. This, however, does not set to rest the status of the retiree language. Arbitrator Vaughan held, in his decision, that the rejected proposal would not be made part of the FOP MOU:

> There is no "next step" in bargaining health care issues following rejection. The *rejected proposal is not incorporated into the MOU*, but through the County's budget process, it can be funded and implemented as a Management initiative, outside of collective bargaining.

[FN 23 OMITTED]

The arbitrator's conclusion that the FOP MOU would not contain the revised language is consistent with the language in each Union MOU, including the FOP's, in which "tentative agreements are subject to ratification by the membership of each employee organization." [FN 24 OMITTED] Significantly, the jurisdiction of the unfair labor practice arbitrator was confined solely to the question of whether the FOP could demand additional bargaining with the County over the issue. Mr. Vaughan was clear, in his decision, that the contract question here at issue was not before him:

> There is apparently a contractual grievance, not before me, in the instant ULP claim, with regard to existing retirees and the County contribution for health Insurance. [FN 25 OMITTED]

11

The remaining question — **whether retirees had a vested right to the benefit here sought is answered directly by the unequivocal language of the MOUs: The statement that "the health Insurance subsidy in place at the time of retirement shall remain in effect until the retiree becomes eligible for Medicare" is subject to no interpretation other than that here proposed by the FOP.** When the parties bargained this language, **they made a binding promise to retirees that the subsidy would remain at whatever level existed at their retirement. That is a vested right, and it was not, and could not be, changed by the negotiations discussed in this Opinion.** For these reasons, the finding is that the grievance is timely and that it should be, and is, granted.

AWARD

The grievance is granted. **Officers who retired on or after February 1, 1992 and before July 1, 2007 have a vested right to retain the health insurance split applicable to them as active officers at the time of their retirement. The County is directed to rescind its modification, to reset the contribution split applicable to these officers to 85/15, to continue that split so long as, by the terms of the language, these officers remain eligible and to make whole affected retirees for increased premium amounts improperly charged to them since September 1, 2007.**

(Emphasis added.)

As noted, the Arbitrator's decision that the grievance was timely and that it should be granted — and the accompanying "award" — was entered on July 15, 2008.

On August 14, 2008, the County filed a complaint in the Circuit Court for Baltimore County, seeking to vacate the arbitration award. In its complaint, the County made the following contentions:

- "the Arbitrator exceeded his power, in that he did not have jurisdiction over the Grievance, which was filed on September 14, 2007 after the expiration of the Memorandum of Understanding (MOU) between the Baltimore County Administration and the Fraternal Order of Police,

12

Lodge No. 4 which was in effect from July 1, 2006 through June 30, 2007";

- "the Arbitrator had no authority to provide the relief requested by the FOP [because] the Arbitrator's Award rewrote the healthcare subsidy provisions of the FY 2008 MOU which had been negotiated by the Healthcare Review Committee, FOP Lodge 4's health insurance bargaining agent";

- "[the] Grievance was moot, because the FY 2007 MOU had expired at the time the Grievance was filed on September 14, 2007";

- "[b]ecause the FY 2007 MOU had expired on June 30, 2007, there was no agreement to arbitrate healthcare subsidy language contained in the expired FY 2007 MOU. Accordingly, there was no arbitration agreement as described in Section 3-206 of the Courts and Judicial Proceedings Article, the issue was not adversely determined in proceedings under Section 3-208 of the Courts and Judicial Proceedings Article, and Baltimore County raised its objection in the Arbitration Hearing and in its Post-Hearing Brief";

- **"[t]he Arbitrator's Award usurps the power of the Baltimore County Executive and the Baltimore County Council to enact a budget which provides for health insurance and health insurance subsidies pursuant to the terms negotiated by the Healthcare Review Committee, FOP Lodge 4's bargaining agent";**

- "[there] is no vested future right to the specific benefits prescribed in the expired FY 2007 MOU, as established by long-standing practice and applicable law"; and

- **"[t]he Arbitration Award is contrary to the very clear public policy, as stated in the Baltimore County Charter and Code, that the Baltimore County Council appropriates the funds needed to provide healthcare subsidies for retirees. The Arbitrator has no power or authority to order the Baltimore County Council to appropriate funds as stated in his Award."**

(Emphasis added.)

The County further argued that "retirees" are not "employees," and therefore FOP was not empowered to file a class grievance on behalf of retirees. The County asserted:

> Section 1.2 of the FY 2007 MOU states that "the term 'employee' shall mean all sworn personnel up to and including the rank of Lieutenant of the Police Department." The award on its face relates to the rights of retirees. Since retirees by definition are not "employees" covered by the MOU, FOP did not have the contractual right to file a class grievance on behalf of retirees as set forth in Section 8.4 of the MOU, . . . .

The County also contended that the "Award involves mistakes so gross as to constitute manifest injustice," and that the award "contains mistakes of law and fact which are apparent on the face of the Award." The County requested that the circuit court vacate the arbitration award and remand the matter back to the Arbitrator with instructions to deny the FOP's grievance. On March 13, 2009, the County filed a Motion for Summary Judgment in which it presented arguments asserting the above points.

On April 3, 2009, FOP filed an opposition to the County's motion for summary judgment, along with FOP's own cross-motion for summary judgment.

On August 28, 2009, the Circuit Court for Baltimore County denied both the County's motion for summary judgment and FOP's cross-motion, and the motions judge explained that "[t]here are too many questions that need to be asked for summary judgment to be granted in this case." Both parties filed motions for reconsideration, and by order of court filed October 21, 2009, the motions for reconsideration were denied.

On May 24, 2010, motions for summary judgment were again heard by the Circuit Court for Baltimore County. On August 17, 2010, the court filed a memorandum opinion

14

and order denying the County's motion for summary judgment and granting the motion for summary judgment filed by FOP. Because several of the issues addressed in the circuit court's grant of summary judgment to FOP have been argued in this Court once again in the County's present appeal, we will reproduce here portions of the circuit court's August 17, 2010, opinion and order in favor of FOP, which, as noted above, has been previously affirmed by the Court of Appeals.

First, the circuit court found that the grievance was timely and the award was arbitrable. The circuit court stated: "Here, unlike the facts presented in [*Barclay Townhouse Associates v. Stephen L. Messersmith, Inc.*, 67 Md. App. 493 (1986), a case cited by the County in support of its argument that the determination of the existence of an agreement to arbitrate is made by the court rather than the arbitrator], there was a written agreement between the County and the FOP to arbitrate any grievance filed under the MOU. [FN 24 OMITTED]" Accordingly, the court found the FOP's claim properly subject to binding arbitration:

> Applying the principles established in *Nolde* and *Litton*, the Court finds that the grievance was arbitrable, despite the fact that the MOU had expired prior to its filing. The FY 2007 MOU clearly stated: "The health insurance subsidy in place at the time of retirement *shall* remain in effect until the retiree becomes eligible for Medicare." [FN 41 OMITTED] The clear, unambiguous language of the agreement creates a promise to retirees that the subsidy in place when they retire will remain the same until they become eligible for Medicare. As such, the retirees at issue have a vested right to the maintenance of that subsidy until they become Medicare eligible. As the Court noted above, each MOU since FY 1996 has contained similar language. Additionally, the FY 1996 agreement retroactively included those officers that had retired between 1992 and 1995. Consequently, the officers that retired

15

while these agreements were in place obtained the vested right. Therefore, the FOP's grievance, alleging that the County's action of increasing the subsidy splits after the agreement had terminated infringed on the vested right to maintain the prior split, arose under the contract as defined by *Litton*. As a result, Arbitrator Bloch had proper jurisdiction to arbitrate the grievance.

(Emphasis in circuit court's opinion.)

As noted, the circuit court specifically addressed, and rejected, the County's assertion that the grievance was not timely filed:

> The County contends that Arbitrator Bloch should have dismissed the grievance for being untimely. The FOP's grievance was related to the FY 2007 MOU, which expired on June 30, 2007. Section 8.2 of the MOU required a grievance to be filed "within ten (10) workdays of the event giving rise to the grievance, or within ten (10) workdays following the time when the employee should have reasonably gained knowledge of its occurrence." [FN 42 OMITTED] Here, the County contends that the event giving rise to the grievance occurred on March 12, 2007 when the FOP rejected the terms negotiated by the HCRC for the FY 2008 MOU. The County further argues that because the FOP was claiming a vested right in the FY 2007 MOU, the grievance had to arise, at the latest, on the date the MOU expired — June 30, 2007. The FOP didn't file its grievance until September 14, 2007, which was more than ten workdays after the MOU had expired. As a result, argues the County, Arbitrator Bloch should have dismissed the grievance as untimely. The Court disagrees.
>
> The question of whether a grievance is timely filed is for the arbitrator. [FN 43 OMITTED] The Court finds no error with Arbitrator Bloch's award in relation to the timeliness of the grievance. Even though the FY 2007 MOU expired on June 30, 2007, the actual infringement of the vested right contained within the agreement, and [which] was the subject of the grievance, did not occur until the County implemented changes to the health insurance subsidy splits on September 1, 2007. It was at that point the effected [sic] retirees became subject to increased subsidy splits, which gave rise to the grievance. The FOP filed its grievance on September 14th, which was within ten workdays of the event giving rise to the grievance, as required under the MOU. Therefore, Arbitrator Bloch did not err by not dismissing the grievance as untimely.

16

The court also rejected the County's argument that retirees are not "employees" entitled to bring a grievance — an argument that the County has renewed in this appeal:

> The County contends that the FOP's filing does not constitute a grievance because, under the terms of the MOU, the FOP may only file a grievance on behalf of employees. [FN 44 OMITTED] Section 1.2 of the MOU defines employees to "mean all sworn personnel up to an[d] including the rank of Lieutenant of the Police Department." The County argues that since the FOP's grievance was filed on behalf of retirees who, by the terms of the MOU, are not employees, the FOP did not have a contractual right to file a class grievance on their behalf.

> The County cites to *Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass Co.* [(404 U.S. 157 (1971)] to support its contention. [FN 45 OMITTED] In *Allied*, the Supreme Court held that retirees are not employees within the meaning of § 8(a)(5) of [the] National Labor Relations Act and could not be included in the collective bargaining unit. [FN 46 OMITTED] At issue in the case was whether the employer had committed an unfair labor practice by making unilateral changes to retiree benefits instead of bargaining for those changes with the union. This is very different from the issue presented by the County in this present case.

> In *United Steelworkers of America v. Canron, Inc.* [(580 F.2d 77 (3rd Cir. 1978)], the Court of Appeals for the Third Circuit was presented with a situation similar to this Court. In *Canron*, the union argued that the collective bargaining agreement obligated the employer to arbitrate a dispute over retiree benefits. [FNs 47 & 48 OMITTED] The employer countered that under *Allied*, the union lacked standing to sue on behalf of retirees. [FN 49 OMITTED] The Third Circuit rejected the employer's contentions, reasoning that if the employer had contractually agreed to continue making premium payments for retirees, "then under accepted contract principles the union has a legitimate interest in protecting the rights of the retirees and is entitled to seek enforcement of the applicable contract provisions." [FN 50 OMITTED] Specifically addressing the holding in *Allied*, the Third Circuit stated:

> > Even though retirement benefits of former employees already retired are not a mandatory subject of collective bargaining, "it does not naturally follow, as the company implies, that a union loses all interest in the fate of its members once they retire." We

17

therefore hold that the plaintiff union has standing to represent the retirees in seeking arbitration under its labor contract with Canron. [FN 51 OMITTED]

The Third Circuit's reasoning with regard to *Allied* is reinforced by the Eighth Circuit's decision in *Anderson v. Alpha Portland Industries, Inc*. [(752 F.2d 1293 (8th Cir. 1985)] [FN 52 OMITTED] In *Anderson*, retired employees sued their former employer in federal district court after the employer announced it was terminating insurance benefits for retirees. [FN 53 OMITTED] The District Court entered summary judgment in favor of the employer on the basis that the retirees had not exhausted the grievance procedures referenced in the insurance agreement and contained in the collective bargaining agreement. [FN 54 OMITTED] In reversing the District Court, the Eighth Circuit rejected the employer's contentions that case law, including *Canron*, required retirees to proceed through the union in order to pursue their disputes. [FN 55 OMITTED] However, the Court noted, *Canron* does provide "that a union has standing to assert retirees' rights under a collective bargaining agreement to which it is a party *if it chooses* and that an employer may not refuse to arbitrate its contractual obligations with the union." [FN 56 OMITTED] [(Emphasis in original.)]

Here, it is clear that the FOP is a party to the FY 2007 MOU and that it has chosen to assert the rights of its retired members. As a result, the County may not refuse to arbitrate with the FOP over its contractual obligations to retirees. Based on the foregoing law, this Court finds that Arbitrator Bloch did not err in arbitrating the grievance made on behalf of retirees.

The County also maintained that the arbitrator's finding that the retirees' rights to the subsidy split in place at the time of their retirement was vested was manifest error requiring vacation of the arbitration award, but the circuit court rejected this argument and explained:

The County stridently maintains that Arbitrator Bloch's finding of a vested right to the health insurance subsidy in place at the time of an officer's retirement was an error so gross as to work a manifest injustice. The County contends that the letter of [the] County Administrator [] regarding the Retirement Incentive Program in 1991 made clear the County's intention that health care subsidies for retirees could go up or down depending on future labor negotiations. [FN 57 OMITTED] In light of this fact, the County argues,

18

retiree health insurance subsidies are not vested rights and the language in Section 7.3(c) of the 1997 MOU can in no way be interpreted as providing such.

* * *

Here, Arbitrator Bloch concluded that the language contained in Section 7.3(c) was unequivocal and subject to only one interpretation — that the County made a binding promise to retirees that the subsidy split in effect at the time of their retirement would remain unchanged. Arbitrator Bloch's conclusion is awarded a great deal of deference by this Court. [FN 60 OMITTED] . . . Based on the foregoing facts and applicable law, the Court finds that Arbitrator Bloch did not commit manifest error, as alleged by the County, in concluding that the MOU created a vested right.

Finally, the County made arguments related to its contentions that the arbitration award disregarded the negotiations of the Healthcare Review Committee, and that the award otherwise contravenes County budget procedures. These arguments are renewed in the present appeal. We will quote here the circuit court's ruling relative to these arguments:

Lastly, the County contends that Arbitrator Bloch exceeded his authority by effectively rewriting the health care subsidy provisions negotiated by the HCRC on behalf of the FOP for the FY 2008 MOU and by ordering the County to maintain the 85/15 subsidy split for officers that retired after February 1, 1992 and before July 1, 2007.

Specifically, the County argues that Arbitrator Bloch exceeded his authority as set forth [at] Section 8.3, Step 4 of the FY 2007 MOU. That section provides:

The arbitrator shall have no authority to add to, detract from, alter, amend or modify any provision of this Memorandum of Understanding or any rules or regulations of any agency of the County, or establish or alter any wage rate or wage structure. [FN 62 OMITTED]

19

**The County further asserts that the Award was contrary to the Budgetary and Fiscal Procedures set forth in the Baltimore County Charter and the Baltimore County Code, which state the County Executive and County Council are responsible for enacting a budget and appropriating funds needed to run the County, including health care subsidies. Arbitrator Bloch's Award, the County argues, usurped these powers by ordering the County to maintain and fund the 85/15 subsidy split.**

The FOP counters that Arbitrator Bloch's Award concerned only the interpretation and enforcement of compensation terms that were previously set, and as such, does not usurp either the legislative or executive power of the County. The FOP points to the distinction between grievance arbitration, which uses a neutral third party to resolve a dispute over the interpretation of an existing contract, and interest arbitration, which uses a neutral third party to set the terms of a new contract. Under the prevailing case law, argues the FOP, grievance arbitration does not involve the delegation of legislative authority because the arbitrator is acting in [a] judicial capacity rather than a legislative one. [FN 63 OMITTED] "The authority to interpret an existing contract, therefore, does not constitute legislative authority, and the nondelegation principle is not implicated in grievance arbitration." [FN 64 OMITTED]

The Court agrees with the FOP's position. The County and the FOP agreed to submit "any dispute concerning the application or interpretation of the terms of [the FY 2007] Memorandum of Understanding" to binding arbitration. [FN 65 OMITTED] The grievance submitted to Arbitrator Bloch concerned the interpretation of Section 7.3(c), a contract term that had already existed and had been bargained for by the parties. In resolving the grievance, Arbitrator Bloch did no more than what was required of him – to interpret the disputed contract language in accordance with the facts presented and applicable law. Therefore, the Court finds that Arbitrator Bloch did not exceed his authority i[n] reaching his Award.

(Emphasis added.)

On August 19, 2010, the County noted its appeal of the circuit court's grant of summary judgment in favor of FOP and the denial of the County's own motion for summary judgment. In an unreported opinion filed on December 8, 2011, this Court reversed the

20

circuit court.  We held that FOP had not been entitled to summary judgment in its favor as a matter of law, and that the County had demonstrated its entitlement to summary judgment. *Baltimore County, Maryland v. Baltimore County Fraternal Order of Police, Lodge No. 4* (No. 1428, September Term, 2010).  In our opinion, we noted that, in the County's brief, it had presented us with nine questions (which are strikingly similar to five of the questions raised by the County in the present appeal):

1.  Whether the arbitrator lacked jurisdiction to arbitrate the grievance and whether the grievance was arbitrable, because the FY 2007 MOU had expired?

2.  Whether the grievance was moot due to the expiration of the FY 2007 MOU?

3.  Whether the grievance was timely filed?

4.  Whether the FOP's late filing constituted a valid grievance since by definition "retirees" are not "employees" entitled to bring a class grievance?

5.  Whether the Arbitrator had the authority to rescind and rewrite the language negotiated by the Health Care Review Committee, FOP's health care benefit bargaining agent?

6.  Whether there was a "vested right" to future health insurance benefits and subsidies prescribed in the expired FY 2007 MOU, based on the evidence, long-standing practice and applicable law, and whether it was manifest error for the Arbitrator to conclude so by relying on cases that interpret the NLRA?

7.  Whether the Arbitrator's own comments demonstrated the manifestly unjust and grossly mistaken nature of his award?

8.  Whether the County clearly intended that health care subsidies would be negotiated annually and could "go up and down"?

21

9. Whether, contrary to law and public policy, the Arbitrator's Award usurped the power of the Baltimore County Executive and the Baltimore County Council to enact a budget which provides for health insurance and health insurance subsidies pursuant to the terms negotiated by the HCRC, FOP Lodge's bargaining agent?

In the footnote in which this Court recited the County's nine questions presented in that previous appeal, we said: "For the reasons stated in our opinion, we cannot provide a certain answer to the County's first question. Instead, we hold that the circuit court erred when it upheld the arbitration award and we leave the remaining questions to be resolved in a future arbitration or civil proceeding, if this litigation continues." The mandate of this Court was: "Judgments Reversed. Case remanded to the Circuit Court for Baltimore County with instructions to enter judgment in favor of [the County]. Costs to be paid by [FOP]."

But FOP's petition for writ of *certiorari* was granted by the Court of Appeals. It appears that no cross-petition or conditional cross-petition was filed by the County. On November 19, 2012, the Court of Appeals reversed this Court's judgment in favor of the County, and reinstated the judgment of the circuit court. The Court of Appeals ruled:

> **We agree with the Circuit Court's decision to leave undisturbed the arbitrator's findings in this case.** The fact that the MOU has expired does not mean the County had no duty to arbitrate disputes arising out of that MOU. A dispute may be arbitrable after the expiration of the underlying agreement, if the agreement contained a broad arbitration clause and the rights that are the subject of the dispute accrued or vested during the life of the agreement.
>
> The MOU's arbitration clause was broad. It did not exclude grievances arising after the expiration of the MOU but pertained to "[a]ny dispute concerning the application or interpretation" of the MOU. The arbitrator found that FOP's grievance was arbitrable even after the MOU's expiration because — based on the arbitrator's reading of the MOU's health-insurance

22

clause — retirees' rights to an 85/15 health-insurance premium split had vested at the time of their retirement. **The Circuit Court was legally correct in granting summary judgment in FOP's favor** after subjecting the arbitrator's findings to a deferential standard of review. Thus, we reverse the judgment of the Court of Special Appeals.

*FOP Lodge No. 4, supra,* 429 Md. at 564-65 (emphasis added). The mandate of the Court of Appeals was not to remand to this Court so that all nine questions presented by the County in its 2011 appeal to this Court could be answered; instead, the mandate ordered a remand to this Court **"with directions to affirm the judgment of the Circuit Court for Baltimore County"** (emphasis added), with costs in both this Court and the Court of Appeals to be paid by the County.

The County filed a motion for reconsideration in the Court of Appeals on December 7, 2012. In that motion, the County asserted: 1) the FOP was bound by the negotiations of the Healthcare Review Committee (HCRC), which agreed to the reduction in the subsidy split (a reduction to which FOP expressly did not agree); and 2) "[c]onsistent with many prior decisions of this Court, this case should be remanded to the Court of Special Appeals for consideration of all undecided appellate issues." As to this last point, the County specifically asserted the following:

> Of great practical consequence to the County, **there has been no review of the following issue which was raised by the County in its Brief in the CSA**:
>
> > Contrary to law and public policy, the arbitrator's award usurps the power of the Baltimore County Executive and the Baltimore County Council to enact a budget which provides for health

23

insurance and health insurance subsidies pursuant to the terms negotiated by the HCRC, FOP Lodge 4's bargaining agent.

(Baltimore County's CSA Brief at 34).

**The Arbitrator in this case had no power or authority to order the County Executive and the County Council to fund a split different from the negotiated split enacted into law as part of the FY 2008, 2009, 2010, 2011 and 2012 budgets, to order the County Executive and County Council to reset the split at 85/15 in any future budgets, or to "make whole" affected retirees for increased premium amounts not budgeted by the County Executive and County Council.**

If this Court's decision is allowed to stand, and this matter is remanded to the CSA with directions to affirm the judgment of the Circuit Court for Baltimore County, the Arbitrator's affirmed award will be unenforceable, since there have been no funds appropriated through the executive budget process to afford the relief capriciously dictated by the Arbitrator.

(Emphasis added.)

On January 18, 2013, the Court of Appeals denied the County's motion for reconsideration. 429 Md. 533. The mandate of the Court of Appeals issued the same day, and, as noted above, it directed this Court to affirm the judgment of the Circuit Court for Baltimore County. It did not direct this Court to consider further any other "undecided appellate issues."

On March 5, 2013, FOP filed in the circuit court a petition for award of costs and disbursements, seeking $130,691.90 in costs and disbursements, including attorneys' fees. The petition was supported by billing records and an affidavit of trial counsel.

On April 5, 2013, FOP filed in the circuit court a "motion to enforce this court's judgment and for an order to show cause." The motion asserted that the County "refuses to

24

comply with this Court's judgment by providing the required relief." FOP further asserted that the County's refusal was "without any justification and accomplishes nothing other than to further delay resolution of this matter and gratuitously increase the parties' expenses by unnecessarily prolonging litigation." In support of the requested relief, the motion stated:

> . . . Notwithstanding the issuance of the mandate by the Maryland Court of Appeals and the order by the Court of Special Appeals vacating its earlier decision, the County refuses to provide the required relief.
>
> First, the County has refused to rescind its reduction of the retiree health care subsidy in effect at the time of each officer's retirement. Stated differently, the County continues to overcharge retirees for health insurance.
>
> Second, the County refuses to make those retirees whole for the amounts that the County improperly charged to them. In this regard, the County has previously provided the FOP with a chart showing the amounts by which the County had charged each retiree above the rates in effect at the time of retirement. That chart, which is attached as Exhibit 3, shows that for overcharges through May of 2011, the County owes the retirees collectively $572,887.10, plus appropriate interest. The County has also refused to provide the data to calculate the amounts by which the County has overcharged retirees from May 2011 through the present.
>
> . . . In an effort to bring this longstanding litigation to a close without further delay or expense to either party, since the issuance of the Court of Appeals decision in November of 2012, FOP's counsel has made many attempts to discuss with the County the County's provision of the required relief to the affected retirees. On each occasion, the attorney for the County has stated simply that the County is continuing to consider its options. At no point, however, has the County offered any explanation as to why it was not providing the relief required by this Court's order and judgment, as affirmed by the Maryland Court of Appeals, or a timeline by which it would provide the required relief.
>
> Accordingly, in order to resolve this matter without further litigation, on March 20, 2013, the FOP sent the County Attorney correspondence requesting that the County promptly take the following steps:

25

1.  Effective April 1, 2013, the County must provide each affected retiree with the retiree health subsidy in place at the time of his or her retirement.

2.  The County must issue payment to the affected retirees in the amounts identified in [Exhibit 3] by Friday, March 29, 2013.

3.  In order to determine the additional amount that the County owes the affected retirees, by March 26, 2013, the County must update the attached chart [Exhibit 3] through March 31, 2013 (or later if the County fails to change the retiree health subsidy provided to the affected officers by that date) and provide the FOP with a copy of the entire chart in Microsoft Excel format.

4.  The County agrees that it is required to pay pre- and post-judgment interest at the legal rate.

. . . The County simply ignored this correspondence and continues to refuse to provide any of the relief required by this Court's judgment. [FN 1 OMITTED] . . .

On April 23, 2013, the County filed a response to FOP's motion to enforce the judgment. In its response, the County failed to refute FOP's contention that the County was refusing to comply with the court's order which confirmed the arbitration award. Instead, the County continued to dispute the validity of the arbitration award, and asserted once again that it was "contrary to the very clear requirements as stated in the Budgetary and Fiscal Procedures set forth in Article VII of the Baltimore County Charter and in § 10-1-113 of the Baltimore County Code." The County argued that — despite the circuit court's previous ruling which was affirmed by the Court of Appeals — under the Baltimore County Code, Charter, and

26

controlling case law, the Arbitrator had no power or authority to order the County Executive and County Council to fund a split different from the negotiated split enacted into law as part of the FY 2008, 2009, 2010, 2011, 2012, and 2013 budgets, to order the County Executive and County Council to reset the split at 85/15 in any future budgets, or to "make whole" affected retirees for increased premium amounts not budgeted by the County Executive and County Council.

The County further argued that the circuit court lacked the "power or authority" to enforce the arbitration award. The County also asserted: that "any rescission and resetting of the health care subsidy split would violate the agreement FOP's bargaining agent, the Health Care Review Committee, made with the County"; that the circuit court's August 10, 2010, order granting summary judgment in favor of FOP did not constitute "an enforceable judgment against the County for a sum certain"; that the arbitrator lacked the authority "to rescind and rewrite the language negotiated by the Health Care Review Committee, FOP's bargaining agent"; that "FOP never proved and the Arbitrator never determined the amount which would 'make whole affected retirees' or any liquidated sum that could be reduced to a judgment against the County"; that the "separation of powers doctrine prohibits this Court from ordering the County Executive and the County Council to appropriate funds, long after the Budgets for FY 2008-2013 have been enacted"; and finally, that "[e]nforcement of the Award at this stage of the proceedings would violate the County's statutory right to have the [nine] issues it raised in the Court of Special Appeals [in the 2011 appeal] adjudicated."

On May 17, 2013, the circuit court held a hearing on FOP's motion to enforce. At the hearing, counsel for the County indicated that the County was still pressing the arguments

it had raised in the first appeal. The application of the law of the case doctrine to the County's public-policy argument is supported by the following colloquy:

[BY THE COUNTY]:     Thank you, Your Honor. Before I discuss the seven arguments I presented in our response to the Motion to Enforce, I would like to characterize those seven arguments as essentially one argument which I did not articulate in specific terms but it is the public policy exception to the enforcement of an arbitration award and, in effect, our arguments, **our seven arguments are asking this Court to find that as a matter of public policy as expressed in the Batimore County Charter and the Baltimore County Code, this matter is not enforceable**. Now, there's two parts to this procedure. One is our Complaint to Vacate the Award. [FOP's counsel] has conveniently ignored the fact that the Court of Special Appeals reversed this Court and said that your decision was wrong. Now, is it wrong for us to believe an arbitrator's award is beyond his powers to then file a Complaint to vacate that award with this Court. This Court agreed with the arbitrator, then file an appeal to the Court of Special Appeals, which agreed with us. So there is at least some debate here about the issues, legal issues. So up to the point where the Court of Special Appeals affirmed us, the case would have been in our favor. Of course, then I had to go through the Court of Appeals and, unfortunately, the Court of Special Appeals did not address the nine legal issues we raised, which we're entitled to have addressed under the Court[s] and Judicial Proceedings Article in a direct appeal to that Court and if the Court will recall ----

[BY THE COURT]:     **But you made, you made that argument to the high, to the highest Court of this, of this State.**

28

[BY THE COUNTY]: **I did**, I argue, **I did make the argument**, I said —

[BY THE COURT]: **And they rejected it, right**?

[BY THE COUNTY]: Well, **they did** but the legal issues have not been decided, Your Honor. Where does that leave us?

[BY THE COURT]: It leaves you with a Court of Appeals opinion.

[BY THE COUNTY]: And the Court of Appeals opinion, to be quite frank with you, was rendered to, to that Court, to uphold a princip[le] concerning vesting. That's all they were interested in. That was their agenda. Why? I don't know. They didn't want to hear anything else. They didn't want to hear the fact that the bargaining agent for FOP and all of the unions sat down, negotiated with the County and agreed to this reduction. Simple contract law. They're your agent, you agreed to it, the principal is bound. So if there's any bad faith in this case, it's the bad faith of the FOP. To sit, to agree that the health care agent is bargaining for them, they reach an agreement with the County and then FOP wants to pull the rug out from under the whole thing.

[BY THE COURT]: Well, that's why the whole thing was litigated.

[BY THE COUNTY]: That's correct.

[BY THE COURT]: And you have a Court of Appeals opinion.

[BY THE COUNTY]: But my, my point of bringing it up is we sat across the table with them and bargained with the health care bargaining agent and reached an agreement which now they want, they have nullified.

29

[BY THE COURT]: Well, I mean, you don't suggest that this whole issue has to be re-litigated?

[BY THE COUNTY]: No, I'm saying at this point, well, as far as I'm concerned, the nine issues remain unaddressed. The Court of Special Appeals said that the arbitrator did not address the County's argument that the arbitration clause itself had expired. The Court [of Special Appeals] determined that this omission was a palpable mistake and the award should have been vacated. According to the Court of Special Appeals reversed the judgments of the Circuit Court granting FOP's Motion for Summary Judgment and denying the County's Motion for Summary Judgment which should have been granted. And the Court [of Special Appeals], in its footnote, first footnote in the case, listed the nine issues.

[BY THE COURT]: All right.

[BY THE COUNTY]: And indicated that those are, would only be addressed necessarily in any future litigation.

[BY THE COURT]: Well, that's the Court of Special Appeals.

[BY THE COUNTY]: That's correct.

[BY THE COURT]: The Court of Appeals is saying something different.

[BY THE COUNTY]: Well, the Court of Appeals never ruled on this issue. All they did was —

[BY THE COURT]: And the Court of Appeals is saying the Court of Special Appeals doesn't need to.

[BY THE COUNTY]: They reversed the Court of Special Appeals and remanded it directly back to this Court for entry of judgment.

30

| | |
|---|---|
| [BY THE COURT]: | Well, no, they remanded it to the Court of Special Appeals. |
| [BY THE COUNTY]: | To have it remanded back here. |
| [BY THE COURT]: | Right. |
| [BY THE COUNTY]: | For entry of judgment — |
| [BY THE COURT]: | **They didn't tell the Court of Special Appeals to address those issues**. |
| [BY THE COUNTY]: | No, **they did not.  That was what we were requesting** — |
| [BY THE COURT]: | So what right do I have, **what power do I have to do that**? |
| [BY THE COUNTY]: | **You do not have that power**.  I'm just bringing it up as a matter of fairness.  We had been denied the opportunity in a direct appeal to have our issues decided. . . . |

(Emphasis added.)

In a later colloquy, the County attempted to explain why its current arguments about the unenforceability of the award were not exhausted:

| | |
|---|---|
| [BY THE COURT]: | So if, if, I guess I'm confused because if the, **if the issue is that because there's no appropriation made, tough luck, I guess basically, why did the County ever file to vacate the arbitration award?**  Why did you just, **why didn't you just say it's not appropriated, we don't need to worry about it**. |
| [BY THE COUNTY]: | **Because we felt that there were very sound legal arguments to be made as to why that** |

31

**arbitration award was erroneous.** And, again —

[BY THE COURT]: But if it's not appropriated, why waste five years? Why not just say, it's not appropriated, we don't have to pay it?

[BY THE COUNTY]: Well, as the matter moved forward, because there was no appropriation, because the health care agent, the health care review committee, the bargaining agent, had reached an agreement and under the budgetary process, that was the number that then became part of the budget submission that was passed by the Council and that has occurred each successive year. Now, why was it done? Because we felt like the, why did we appeal, why did we seek to vacate? Because we, we —

[BY THE COURT]: Yeah, I mean, if it's not appropriated.

[BY THE COUNTY]: — thought it was wrong. **We thought it was wrong and, it was legally wrong and we felt like we would win on that basis.**

[BY THE COURT]: **So win or lose, this was another argument you were, the County had that it was going to pull out of its back pocket at some time?**

[BY THE COUNTY]: No, this was not pulled out of the back pocket, Your Honor. It was, it was —

[BY THE COURT]: Well, you're, you're saying it wasn't appropriated so we don't have to pay it. Why not just say, okay, the award is the award and we just don't have to pay it because it's not appropriated?

[BY THE COUNTY]: That's what we're saying now.

[BY THE COURT]: I know you're saying that now.

32

| [BY THE COUNTY]: | Now that they're trying to enforce it. |
|---|---|
| [BY THE COURT]: | So why'd you wait five years? |
| [BY THE COUNTY]: | Because it was not at the position where it would be enforced.  Now, it's trying to, that's point. |
| [BY THE COURT]: | Okay. |
| [BY THE COUNTY]: | The public policy does not allow its enforcement.  We were trying to attack the legal basis, that, **we were trying to attack the award as legally unsound** for the reasons which have never been decided by any Court.  **Now that it's being enforced or attempted to be enforced, we're saying public policy bars its enforcement.** |

(Emphasis added.)

The circuit court took the matter under advisement, and allowed the County to file a supplemental memorandum in support of its public policy argument.  On August 14, 2013, the circuit court issued a memorandum opinion and order granting FOP's motion to enforce.  This order was docketed on August 28, 2013.

The circuit court's opinion took note of all the arguments presented by the County, and concluded that the law of the case doctrine barred any further consideration of the arguments about the enforceability of the award.  The circuit court ordered the County to take the following actions within twenty days: 1) "provide each affected retiree with the retiree health subsidy in place at the time of his or her retirement"; 2) "issue payment in the amount of" $572,887.10, "plus appropriate interest, which is the amount referenced in the chart previously prepared by [the County] and provided to [FOP] in May of 2011, attached as

33

Exhibit 3 to [FOP's] Motion to Enforce," and "issue payments directly to each affected retiree in the proportions set forth in the chart prepared by [the County]"; and 3) update the previously-referenced damages chart with "information sufficient for [FOP] to calculate a sum certain judgment to which it is entitled, including any appropriate pre[-] and post[-]judgment interest," and provide FOP with a copy of the updated damages chart.

On September 6, 2013, the County filed a motion to alter or amend the judgment pursuant to Maryland Rule 2-534. On October 9, 2013, FOP filed its response. On October 15, 2013, the court conducted a hearing on the County's motion. At the hearing, the County continued to raise issues regarding the timeliness of the initial grievance and whether or not retirees were entitled to pursue a grievance. The County again pointed to the nine issues it had previously raised in its first appeal to this Court, and the County also renewed its public policy arguments about the County's failure to make an appropriation to pay the amounts ordered by the Arbitrator. At one point during the hearing, counsel for the County seemed to disavow the reliability of the damages chart which had been previously provided by the County:

| [BY THE COURT]: | Does the, does the County dispute the numbers on this chart? |
|---|---|
| [BY THE COUNTY]: | To be honest with you, I don't know what the numbers really mean and I haven't sorted through them. I don't know, at this point, who prepared them. I haven't been able to track it down. So, no, I don't agree with, and I think I need to, I, there has to be an opportunity for us — |

34

[BY THE COURT]: This is, this is the document, as I recall, that the County supplied to the FOP?

[BY THE COUNTY]: As part of a global settlement discussion of all cases.

[BY THE COURT]: I understand that, but is there any, is there any dispute as to anything on that chart?

[BY THE COUNTY]: I dispute it because I don't know what it says and I don't know how it was arrived at.

[BY THE COURT]: **Have you, have you had a chance to review it?**

[BY THE COUNTY]: **I have reviewed it.**

[BY THE COURT]: **You have?**

[BY THE COUNTY]: **Yes.**

[BY THE COURT]: So having reviewed it, is there anything that you dispute on it?

[BY THE COUNTY]: Excuse us, Your Honor. Basically, there, the numbers are unsubstantiated in any manner which would, could relate to evidence that a judgment could be based on, Your Honor.

[BY THE COURT]: I'm just asking if you dispute anything on it?

[BY THE COUNTY]: I dispute them, yes, I do.

[BY THE COURT]: You dispute, you don't know how the County created it, prepared it and transferred it to the opposing party in good faith negotiations for a global settlement, you dispute what's on there, is that what you're telling this Court?

[BY THE COUNTY]: I personally don't know what it says or who prepared it, therefore, I have to dispute it.

35

[BY THE COURT]:      Okay.  All right.

[BY THE COUNTY]:     And it's not substantiated in terms of a piece of evidence that you put somebody on the stand and say, Mr. Jones —

[BY THE COURT]:      I, I, I understand your evidentiary point. My question is, this document that the County prepared and presented to the FOP, does the County dispute what's on the County's document?

[BY THE COUNTY]:     I can't speak for the County because I can only speak for myself.

[BY THE COURT]:      You're, you're representing the County.

[BY THE COUNTY]:     My investigation of it revealed that I couldn't identify who had prepared it.  Without that, talking to that person, I have to dispute it.

[BY THE COURT]:      Okay.  But as of this point in time, which has been, I don't know when you turned the document over, it's been several years though, right?  Two thousand eleven?

[BY THE COUNTY]:     Yes, it's been a while.

[BY THE COURT]:      All right.  So it's been about two, over two years. Has anything come to your attention, to the County's attention, to, to bring into dispute anything on that document?

[BY THE COUNTY]:     No, because it never came up.  The settlement negotiations ended and that was the end of that. There was not a settlement reached and, therefore, the document became irrelevant.

[BY THE COURT]:      All right.  Have you reviewed it since the Court's Order back in, several months ago?

36

[BY THE COUNTY]: Your Honor's Order?

[BY THE COURT]: Um hm. **Have you reviewed the document?**

[BY THE COUNTY]: **No, I haven't really, I've looked at it but I haven't reviewed it.** I'm not —

[BY THE COURT]: Has anything, is there anything to dispute now about that document?

[BY THE COUNTY]: Yes, the whole thing.

[BY THE COURT]: Okay.

[BY THE COUNTY]: On both substantive, it's unsubstantiated and on evidentiary grounds. I think Your Honor —

[BY THE COURT]: What substantively is incorrect on it?

[BY THE COUNTY]: It has, the document hasn't been substantiated by the testimony of a witness who can say ----

[BY THE COURT]: What, what facts on the document are in dispute?

[BY THE COUNTY]: Well, I wouldn't know that until I have a witness on the witness stand to know what's in dispute and be able to either not prove it or prove it.

[BY THE COURT]: All right.

[BY THE COUNTY]: I'm not trying to play a game, Your Honor. I, I just, you know, this is a document that was prepared for settlement discussion. Now, it's providing the basis for a, I guess, a half million or a million and a half dollar judgment.

[BY THE COURT]: Well, I guess I can understand if there's a dispute as to the amount or the, or the facts on that document, there's a bona fide dispute about that, then you need an evidentiary hearing.

37

[BY THE COUNTY]:    I can't, I can't, as I stand here say —

[BY THE COURT]:    But if there's no, if there's no dispute, then there's no need for a hearing.

[BY THE COUNTY]:    There's –

[BY THE COURT]:    If you're disputing —

[BY THE COUNTY]:    Yes, I'm disputing —

[BY THE COURT]:    If you, as the representative for the County, is disputing the document that the County prepared, I'd like to know what, what is it about that document that the County prepared that the County disputes.

[BY THE COUNTY]:    I'm not sure if the numbers are accurate.

[BY THE COURT]:    Okay.

[BY THE COUNTY]:    But either way, I don't think it's a document that Your Honor can use because it's part of a settlement discussion under the Rules of Evidence. In any event, and, and it shows that rather than using a document that was part of a settlement discussion, there needs to be a hearing where somebody proves something.

[BY THE COURT]:    So, so you're saying the County entered into a settlement discussion without vetting the document that's being used as the basis for that negotiation?

[BY THE COUNTY];    I have no idea. I wasn't part of that.

In response to the County's refusal to admit the reliability of the document that it had previously prepared and provided to the FOP, the court permitted a brief period of discovery

38

for the purpose of ascertaining the damages amount, and the court scheduled a damages hearing for January 28, 2014. As part of its order of November 5, 2013, the court stayed paragraphs 3 and 4 of its order of August 28, 2013; in other words, it stayed the part of the order requiring the County to pay $572,887.10, "plus appropriate interest," and to update the damages chart within 20 days.

On November 8, 2013, the County noted an appeal to this Court of the November 5, 2013, order. It also filed a motion for a stay pending appeal, which was denied by the circuit court in a memorandum opinion and order filed on December 15, 2013. The County then made application to this Court for a stay pending appeal, and that was denied on December 26, 2013.

A damages hearing was held on February 6, 2014. Admitted in evidence as FOP's Exhibit 1 was an updated chart, provided by the County, showing that the updated damages amount through the end of January 2014 was $1,413,120.81. That balance was growing by approximately $28,000 per month for every month the County refused to comply with the court's previous orders to reset the subsidies and "make whole" the retirees. FOP produced an expert economist who testified as to pre- and post-judgment interest, which, at the time of the damages hearing, was "a little over $219,000 in total" and growing by "approximately $7,000 to $8,000 of interest each month." FOP also produced evidence showing that its total attorneys fees were up to $240,412.80.

39

At the damages hearing, the County again argued that FOP was entitled to no damages whatsoever. FOP called as its first witness Becky Ellis, a health-insurance administrator for the County and the individual who prepared the damages spreadsheet at issue that reflected that the County owed the affected retirees in excess of $1.4 million. The County objected to the admission of the document prepared by its employee at its direction on the basis that, "although it's authentically what she prepared, what [it] is being presented for is not proper[.]" The objection was overruled.

When it came time to cross-examine Ms. Ellis, the County asked its employee, "[d]oes the County owe the retirees [ ] damages?" The question drew an objection that was sustained. The County explained that the question "relates to our argument that these retirees are entitled to zero damages." The County then proffered that Ms. Ellis's "answer would be that there are no damages because the Health Care Review Committee agreed to the change in the subsidy rate."

FOP then called its expert economist, Dr. Amy McCarthy, to testify regarding her interest calculations, which showed that the amount of interest that accrued between September 1, 2007, and December 31, 2013, was $219,175.22.

The County was then permitted to call a witness, Fred Homan, out of turn. Mr. Homan testified that he was the County administrative officer, "responsible for the day-to-day operation of the county." Prior to holding his then-current position, Mr. Homan had been the Director of Budget and Finance for the County from November 1989 until July 2007.

40

The County's repeated attempts to have Mr. Homan testify that it was his opinion that the retirees were not due any compensatory damages drew objections that were sustained, but the County was permitted to proffer what Mr. Homan's testimony would be. Among the contentions appellant makes on this appeal is a claim that the court, in sustaining "virtually every objection by FOP to every substantive question posed to the County's witnesses," committed legal error in "refus[ing] to allow the County's witnesses to give any substantive testimony" at the February 6, 2014 damages hearing. The following colloquy reflects the proffered testimony that was excluded.

| | |
|---|---|
| [BY THE COUNTY]: | Mr. Homan, in your capacity as the County's administrative officer and being the director of Budget and Finance, you're familiar with the County's executive budget system — |
| [BY FOP'S COUNSEL]: | Your Honor, I object to the relevance of what I am now imagining this entire line of questioning to be, to not be about ascertaining the amount of damages which is the sole purpose of this hearing, but instead to relitigate for countless time the merits of this litigation. |
| [BY THE COURT]: | Mr. [County's counsel]? |
| [BY THE COUNTY]: | Your Honor, again, this goes back to our contention that with respect to this damages hearing there are no damages, and Mr. Homan will explain why. |
| [BY THE COURT]: | Okay. I'll sustain the objection. |
| [BY THE COUNTY]: | Then I would like to make a proffer. |

* * *

41

Mr. Homan will testify that under the County's Executive Budget System as set forth in the Baltimore County Charter and Code, specifically Section 715 of the Charter and Section 10-1-113 of the Baltimore County Code, which if he were allowed to testify I would offer as exhibits in support of his testimony. The Executive Budget System entered into and formed a part of the FY 2007 MOU as if expressly referred to and incorporated into the MOU, and that's under Maryland case law.

Under that system any agreements [a]ffecting appropriations are fully subject to the County's annual budget process. This principle embraces unlike those provisions which [a]ffect the validity, construction, discharge, and enforcement of a contract. Even if the retirees had a vested right to certain rates, that vested right was fully subject to the Executive Budget System and the agreement negotiated by the Health Care Review Committee.

I'd then ask Mr. Homan the following question — well, I will ask him and if there's an objection I'll proffer the answer.

[BY THE COURT]: All right.

[BY THE COUNTY]: Do you agree or disagree with the following statement, Mr. Homan? If the final enacted ledger contains the agreed upon appropriations from which health care subsidies should have been paid, then is the County obligated to pay —

[BY FOP'S COUNSEL]: I'm gonna object on two —

[BY THE COURT]: All right. Sustained.

[BY FOP'S COUNSEL]: I don't even believe a proffer is appropriate because you're the judge and he's asking now Mr.

42

Homan. That question is improper, period, because —

[BY THE COURT]: I sustained the objection, and you may proffer.

[BY THE COUNTY]: The answer — the proffer would be as follows: If the final enacted budget contains the agreed upon appropriations from which health care subsidies should have been paid, then the County is obligated to pay, but if the final enacted budget contains less appropriations than were previously agreed upon, then the budget controls and the County is only liable up to the amount actually appropriated.

Next question, Mr. Homan, do you agree with the following statement? If the final enacted budgets for FY 2008 to 2014 contain the health care subsidy reductions agreed to by the Health Care Review Committee, then the County is under no obligation to pay any other subsidy —

[BY FOP'S COUNSEL]: Objection, Your Honor.

[BY THE COURT]: Sustained.

[BY THE COUNTY]: The answer would be that if the final enacted budgets —

[BY THE COURT]: This is a proffer.

[BY THE COUNTY]: This is a proffer, correct. If the final enacted budgets for FY 2008 to 2014 contain the health care subsidy reductions agreed to by the Health Care Review Committee, then the County is not under any obligation to pay any other subsidy.

Next question, Mr. Homan, under the C[h]arter and the Code can the County comply with any order of the Court to "issue payment" of alleged

43

excess contributions to affect[ed] retirees "plus appropriate interest" ---

[BY FOP'S COUNSEL]: Objection, Your Honor.

[BY THE COURT]: Sustained.

[BY THE COUNTY]: And the answer would be —

[BY THE COURT]: Proffer.

[BY THE COUNTY]: The proffer would be no. The next question would be why not, and the answer would be —

[BY FOP'S COUNSEL]: Your Honor, if you want me to object to —

[BY THE COURT]: I think you should object.

[BY FOP'S COUNSEL]: Objection.

[BY THE COURT]: Sustained.

[BY THE COUNTY]: The proffer would be because there has never been an appropriation ordinance by the county coun[ci]l for such payments.

Next question, Mr. Homan, under the Charter and Code can the County comply with any order by this Court that the County "shall provide each effective [sic] retiree with [the] health care subsidy in place at the time of his or her retirement" ---

[BY FOP'S COUNSEL]: Objection.

[BY THE COURT]: Sustained.

[BY THE COUNTY]: The answer would be no. The next question to Mr. Homan, why not —

44

| | |
|---|---|
| [BY FOP'S COUNSEL]: | Objection. |
| [BY THE COURT]: | Sustained. |
| [BY THE COUNTY]: | The answer would be — |
| [BY THE COURT]: | It's a proffer. They're all proffers. |
| [BY THE COUNTY]: | The proffer would be because there's never been an appropriation ordinance by the county coun[ci]l for such reset or such repayments — such payments, pardon me. That would be Mr. Homan's testimony. |

A similar pattern of proffers was used during the examination of the County's two other witnesses at the damages hearing, Keith Dorsey and George Gay. Mr. Dorsey testified that, since July 2007, he has been the Director of Budget and Finance for Baltimore County. The following colloquy is pertinent:

| | |
|---|---|
| [BY THE COUNTY]: | Now, pursuant to the budget bearing physical [sic] proceedings of the County Charter and the County Code, was the County Council in its budgetary enactments for FY 2008 and 2014 appropriated the funds to pay for the health care subsidy split negotiated by the Health Care Review Committee in 2007? |
| [BY MR. DORSEY]: | Yes, I did — |
| [BY FOP'S COUNSEL]: | Objection, your Honor. This is outside the scope of today's hearing. |
| [BY THE COURT]: | All right. Sustained. Strike the question and the answer. |
| [BY THE COUNTY]: | Well, observe the same — |

45

[BY THE COURT]: You can make a proffer.

[BY THE COUNTY]: — process.  I will proffer that the answer will be the County has appropriated the funds to pay for the health care subsidy split negotiated by the Health Care Review Committee in 2007.

Next question, Mr. Dorsey, has the County Council in its budgetary enactments fiscal year 2008 to 2014 appropriated the funds to pay for health care subsidy split in effect prior to July 1, 2007 —

[BY FOP'S COUNSEL]: Objection.

[BY THE COURT]: Sustained.

[BY THE COUNTY]: I'll proffer, your Honor.  The answer would be no.

Next question, Mr. Dorsey, has the County Council appropriated the funds for any alleged damages claimed in this case —

[BY FOP'S COUNSEL]: Objection.

[BY THE COURT]: Sustained.

[BY THE COUNTY]: The proffer would be that the County Coun[ci]l has not appropriated any funds to pay for any alleged damages claimed in this case.

Mr. Dorsey, the next question is has the County Council appropriated the funds to pay for any retroactive reset of the retiree health care subsidy splits to their pre-July 1, 2007 level –

[BY FOP'S COUNSEL]: Objection.

[BY THE COURT]: Sustained.

46

| [BY THE COUNTY]: | The proffer is that the County Council has not appropriated the funds for any retroactive reset of the health care retiree subsequent to their pre-July 1, 2007 level. |
|---|---|
| | Mr. Dorsey, has the County Council appropriated the funds to pay for any award of interest, attorney fees or litigation expenses in connection with this case — |
| [BY FOP'S COUNSEL]: | Objection. |
| [BY THE COURT]: | Sustained. |
| [BY THE COUNTY]: | The proffer would be the answer is no, the County Council has not appropriated the funds to pay for any award of interest, attorney fees or litigation expenses. That would be the testimony of — the proffered testimony of Mr. Dorsey. |

George Gay testified next on behalf of the County. At the time of the damages hearing, Mr. Gay was the County's Director of Human Resources, but in his previous position as Labor Commissioner, he denied the FOP's initial grievance in this matter following a hearing on November 6, 2007. Mr. Gay's testimony, in part, was as follows:

| [BY THE COUNTY]: | Let me show you what has been marked as Plaintiff's Exhibit 5. Do you recognize that? |
|---|---|
| [BY MR. GAY]: | It appears to be the grievance filed by the FOP concerning the health care subsidy split. |
| [BY THE COUNTY]: | Is this the grievance that resulted in a hearing that you conducted? |

47

| | |
|---|---|
| [BY MR. GAY]: | I didn't.[3] |
| [BY THE COUNTY]: | What was your finding in connection with that hearing — |
| [BY FOP'S COUNSEL]: | Objection, your Honor. It's outside the scope of today's hearing. |
| [BY THE COURT]: | Sustained. |
| [BY THE COUNTY]: | I will proffer that the result was the grievance was denied. |
| | Mr. Gay, do you see where in the box where it says ["]employee's name["], the ["]Baltimore County FOP Lodge 4["] appears? |
| [BY MR. GAY]: | Yes. |
| [BY THE COUNTY]: | Is FOP Lodge 4 an employee — |
| [BY FOP'S COUNSEL]: | I object, your Honor. Same objection. |
| [BY THE COURT]: | Sustained. |
| [BY THE COUNTY]: | The answer would be as I proffer it, your Honor, no. |
| | Do you see down where it says "Box 2 What do you think should be done about it?" You see that? |
| [BY MR. GAY]: | Yes, uh-huh. |
| [BY THE COUNTY]: | You see anywhere in that box where the FOP requested, "Make whole relief" --- |

---

[3]We assume this is a transcription error; Mr. Gay did conduct a hearing on FOP's grievance on November 6, 2007, and denied the grievance in an opinion he issued on November 19, 2007.

[BY FOP'S COUNSEL]:  Objection, your Honor.  It's outside the scope.

[BY THE COURT]:  Sustained.

[BY THE COUNTY]:  The answer would be no, that's the proffer.  If I could have Exhibit Number 2, please.

I'm showing you what's been previously marked and admitted into evidence as Exhibit Number 2, which is the complaint filed in this case.

I want to direct your attention to Exhibit 2 attached to that complaint, which is the FY 2000 MOU between Baltimore County and FOP Lodge 4.  Do you recognize that?

[BY MR. GAY]:  Yes.

[BY THE COUNTY]:  In looking at that can you explain what the health care subsidy split was as it existed as of the effective date and up to the time it became expired of that MOU?

[BY MR. GAY]:  It varies based on the levels of coverage, because there's an HCP, there's also a triple option plan.

[BY THE COUNTY]:  You said what is it, an HCP?

[BY MR. GAY]:  Yes.

[BY THE COUNTY]:  What does that mean?

[BY MR. GAY]:  Health care preferred, and a PLS plan into said triple option plan.

[BY THE COUNTY]:  Okay.  Is it accurate to say that the amount of the subsidy is various subsidies for the different health plans in this MOU are different from what was negotiated by the Health Care Review Committee in 2007 —

49

[BY FOP'S COUNSEL]:    Objection, your Honor.

[BY THE COURT]:    Sustained.

[BY THE COUNTY]:    The answer as proffered would be yes, these are different.

Let me show you what has been marked as the next County Exhibit, which is Number 6. Do you recognize that document?

[BY MR. GAY]:    Yes.

[BY THE COUNTY]:    What is it?

[BY MR. GAY]:    It's portions of the memorandum of understanding between the County and the American Federation of State, County and Municipal Employees.

[BY THE COUNTY]:    What fiscal year is this MOU effective?

[BY MR. GAY]:    July 1st of 2007 through June 30 of '08.

[BY THE COUNTY]:    So, could we call that one the FY 2008 MOU with A[FS]CME?

[BY MR. GAY]:    Correct.

[BY THE COUNTY]:    Does that MOU incorporate the changes that were negotiated by the Health Care Review Committee during negotiations with that committee regarding the health care subsidies —

[BY FOP'S COUNSEL]:    Your Honor, I object to the question and I also object to the admission of the document, both are outside the scope.

[BY THE COURT]:    Care to be heard, Mr. [County's counsel]?

50

| | |
|---|---|
| [BY THE COUNTY]: | Just trying to establish that the A[FS]CME — this is an illustrative MOU. The Health Care Review Committee negotiated the changes on behalf of all the unions, and they voted in favor of the changes, and FOP was the only one who would not go along with the changes. That's why they filed a grievance. All the other unions as illustrated by this MOU of A[FS]CME agreed to the changes and have abided by them ever since then. This MOU does contain the changes negotiated by the Health Care Review Committee. |
| [BY THE COURT]: | All right. Sustained. |
| [BY THE COUNTY]: | I think my explanation, I ask that be considered the proffer. |
| [BY THE COURT]: | It is. |
| [BY THE COUNTY]: | Just to be clear I offer it into evidence at this time, that is the MOU. |
| [BY THE COURT]: | Any objection? |
| [BY FOP'S COUNSEL]: | Yes, I object to the admission of the document. |
| [BY THE COURT]: | Sustained. It will not be admitted. |
| [BY THE COUNTY]: | Mr. Gay, going back to Exhibit 2 attached to the complaint you have in front of you, which is the FY FOP — |
| [BY MR. GAY]: | FOP, yes. Exhibit 2, I have that. |
| [BY THE COUNTY]: | Do you see under Section 1.2 which appears, the page designated E22, the definition of employee — |
| [BY FOP'S COUNSEL]: | Objection, your Honor. It's outside the scope. |

51

| | |
|---|---|
| [BY THE COURT]: | Sustained. |
| [BY THE COUNTY]: | The answer would be yes, he does see that. I would ask him then to read the definition, and it would be read as follows: "Employee defined. Whenever used in this memorandum of understanding, the term 'Employee' shall mean all sworn personnel up to and including the rank of lieutenant of the police department." |
| | Mr. Gay, the meaning of employee there, does that include retirees — |
| [BY FOP'S COUNSEL]: | Objection, your Honor. |
| [BY THE COURT]: | Sustained. |
| [BY THE COUNTY]: | The proffer would be that the term employee as defined herein does not include retirees. |
| | Does a person who is not an employee have the right to bring a grievance? |
| [BY FOP'S COUNSEL]: | Objection, your Honor. |
| [BY THE COURT]: | Sustained. |
| [BY THE COUNTY]: | The answer would be no, they do not have a right to bring a grievance. |
| | Turning to page E35 of the document, Mr. Gay, do you see Section 8.4, Class Grievance? |
| [BY MR. GAY]: | Yes. |
| [BY THE COUNTY]: | Could you read that, please — |
| [BY FOP'S COUNSEL]: | Objection, your Honor. |
| [BY THE COURT]: | Sustained. |

52

[BY THE COUNTY]:      The reading would be if the grievance —

[BY FOP'S COUNSEL]:      Your Honor, it's already in the record. It doesn't need to be read into the record.

[BY THE COURT]:      Okay. It's in the record.

[BY THE COUNTY]:      Okay.

Are retirees employees entitled to bring a chance [sic] grievance?

[BY FOP'S COUNSEL]:      Objection.

[BY THE COURT]:      Sustained.

[BY THE COUNTY]:      The answer would be no.

Take a look, if you would, at Section 7.2(d), page E29. Do you see that first sentence?

[BY MR. GAY]:      Say that again, please.

[BY THE COUNTY]:      Page E29, Section 7.2(d), Health Care Bargaining Agent. Do you see that?

[BY MR. GAY]:      Yes.

[BY THE COUNTY]:      The first sentence?

[BY MR. GAY]:      Yes.

[BY THE COUNTY]:      What does that state?

[BY FOP'S COUNSEL]:      Objection, your Honor. It's already in the —

[BY THE COURT]:      Sustained.

[BY THE COUNTY]:      Mr. Gay, in your experience have you ever seen a claim for award of attorney's fees in connection

53

|                      | with a grievance, an arbitration or a complaint to vacate an arbitration award? |
|----------------------|------------------------------------------------------------------------------------|
| [BY MR. GAY]:        | No, I haven't.                                                                      |
| [BY THE COUNTY]:     | Is there any provision in the MOU to support such a claim with such an award —      |
| [BY FOP'S COUNSEL]:  | Objection, your Honor.                                                              |
| [BY THE COURT]:      | Sustained.                                                                          |
| [BY THE COUNTY]:     | The answer as proffered would be no. That's all the questions I have of Mr. Gay.    |

On March 6, 2014, the court filed an order reflecting its partial grant of FOP's motion to enforce. The March 6 order awarded FOP, "pursuant to the 'make whole' provision of the Arbitrator's Award," damages of $1,413,120.81, but declined to award any attorney's fees or pre-judgment interest. In a footnote, the court explained:

[FOP] is not entitled to compound pre-judgment interest. *Med. Mut. Liab. Ins. Soc. of Maryland v. Davis*, 389 Md. 95, 112 (2005), *Walker v. Acting Dir., Dep't of Forests & Parks*, 284 Md. 357, 367 (1979). The Court is unable to determine an amount for simple pre-judgment interest because [FOP's] Exhibit 4 computes pre-judgment interest compounded monthly. Accordingly, the Court cannot award pre-judgment interest to [FOP].

Both the County and FOP noted appeals to this Court following entry of the March 6 order.[4]

On February 18, 2014, FOP filed a motion "to clarify amount of prejudgment interest." FOP informed the court that it agreed that, to the extent FOP was owed any

---

[4]FOP filed a Line in this Court on July 31, 2014, dismissing its cross-appeal.

54

prejudgment interest, it was owed only simple interest, not interest compounded in any manner. FOP attached to the motion an affidavit of its expert economist, Dr. Amy McCarthy, in which Dr. McCarthy averred that she had "recalculated the interest owed to the affected retirees based on the amounts reflected in the spreadsheet provided by the County to the FOP," and that, using the annual rate of 6% simple interest, the retirees were owed $213,446.47 in prejudgment interest. A spreadsheet showing the supporting calculations was attached to Dr. McCarthy's affidavit.

On February 26, 2014, the County filed its opposition to the motion. On March 14, 2014, FOP filed a motion to reconsider the March 6 order, pointing to the simple-interest calculations of Dr. McCarthy as sufficient evidence of the amount, and asking the court to perform the "ministerial task" of awarding the properly-computed pre-judgment interest which FOP claimed. FOP additionally noted that it would not object to the County deposing or otherwise questioning Dr. McCarthy. The County filed its supplemental opposition on March 28, 2014. On April 28, 2014, the court granted FOP's motion for reconsideration, and entered an amended judgment awarding FOP the original judgment amount of $1,413,120.81, plus pre-judgment interest of $213,446.47, for a total judgment of $1,626,567.28. On April 25, 2014, the County noted its appeal of the amended judgment order.[5]

_____

[5]The amended order was signed on April 17, 2014, but not docketed until April 28, 2014. However, counsel were copied on the order once it was signed, which may explain how the County was able to note an appeal to this Court on April 25, 2014. *See* Maryland Rule 8-602(d), which deems a notice of appeal filed after the rendering of a judgment, but before the judgment is docketed, as being filed on the same day as the docket entry of the judgment.

Meanwhile, on April 15, 2014, FOP filed a petition for an order of constructive civil contempt against the County, County Executive Kevin Kaminetz, Director of the Office of Budget & Finance Keith Dorsey, and County Administrative Officer Fred Homan.[6]  In its contempt petition, FOP noted that it had been several months since the County's liability had been determined; the County's attempts to have the matter stayed by the circuit court and this Court had failed; and the County's refusal to make payment in accordance with the court's orders left FOP with no other option than to ask that the officials who were refusing to pay be held in contempt.  On April 15, the circuit court issued a show cause order, directing the County and the named officials to appear at a hearing on June 26, 2014, and "show cause why the Court should not hold each in contempt and/or impose sanctions, including incarceration."

On April 14, 2014, the County filed a response to the petition for an order of constructive civil contempt.[7]  It also filed an answer to the petition for an order of

[6] This was FOP's second petition for order of constructive civil contempt. On October 4, 2013, it filed a petition for order of constructive civil contempt against the County and Messrs. Kamenetz and Dorsey.  The County filed an opposition that was docketed on October 2, 2013 — before FOP's petition was even docketed.  It appears that FOP's petition had been transmitted to the County's counsel on September 20, 2013, which may explain why the opposition was docketed before the petition it opposed was docketed. Nevertheless, FOP voluntarily withdrew that first petition for order of constructive civil contempt in open court on February 6, 2014.

[7] The docket entries reflect that FOP filed its second petition for order of constructive civil contempt against the County and Messrs. Kamenetz, Dorsey, and Homan on April 15, 2014, but the County filed its opposition to that petition on April 14, 2014.  The date on the signature page of FOP's petition is March 28, 2014, as is the date on the letter from FOP to the Clerk of the Circuit Court for Baltimore County that accompanied the petition. We

56

constructive civil contempt on April 28, 2014, incorporating by reference its earlier-filed response to that petition. On April 28, 2014, the County also filed a motion to quash the show cause order, and asked the court to exempt the individual County officials from having to personally appear on June 26.

On May 16, 2014, FOP filed an opposition to the motion to quash, and on May 28, 2014, the court denied the County's motion to quash.

On May 30, 2014, the County filed a certification of compliance with outstanding court orders, representing that it had, under protest, paid the judgment amount of $1,413,120.81; $213,446.47 in pre-judgment interest; $55,348.68, representing the subsidy for the months of April and May of 2014; $14,260.32 in post-judgment interest at 10% per annum, accounting from the docketing of the court's amended judgment on April 28, 2014, through May 30, 2014; and $227.70 in post-judgment interest for the April 2014 subsidy, for a grand total of $1,696,403.98. Additionally, the certification contained an affirmation of Keith Dorsey that the subsidy rates had been reset as ordered by the court in its November 5, 2013, order. The rest of the certification made clear that the County made these payments "solely as a result of the coercion and duress imposed upon it," and that it reserved all of its appeal rights. A second supplemental certification followed on June 10, 2014, representing

surmise that the County's April 14 opposition to FOP's yet-to-be-docketed petition was triggered by the County's receipt of FOP's petition sometime between March 28 and April 14.

57

that another payment of $20,209.56 had been made by the County to account for prejudgment interest from February 1, 2014, through April 28, 2014.

In the present appeal, the County challenges the circuit court's orders of November 5, 2013 (ordering the County to reset the retiree health insurance split to the rate in effect at the time of retirement); March 6, 2014 (entering judgment in favor of FOP for $1,413,120.81); and April 28, 2014 (entering an amended judgment in favor of FOP for $1,626,576.28).

**DISCUSSION**

**I.      The Law of the Case doctrine**

The law of the case doctrine provides generally that, "[o]nce an appellate court has answered a question of law in a given case, the issue is settled for all future proceedings" between the litigants. *Stokes v. American Airlines, Inc.*, 142 Md. App. 440, 446 (2002). The doctrine "prevents trial courts from dismissing appellate judgment and re-litigating matters already resolved by the appellate court." *Id.* "The function of this doctrine is to prevent piecemeal litigation." *Fid.-Balt. Nat'l Bank & Trust Co. v. John Hancock Mut. Life Ins. Co.*, 217 Md. 367, 371-72 (1958).

In *Reier v. State Dept. of Assessments and Taxation*, 397 Md. 2, 21 (2007), the Court of Appeals described the doctrine by quoting the following passage from *Fid.-Balt Nat'l Bank & Trust Co.*:

> It is the well-established law of this state that litigants cannot try their cases piecemeal. They cannot prosecute successive appeals in a case that raises

58

the same questions that have been previously decided by this Court in a former appeal of that same case; and, **furthermore, they cannot, on the subsequent appeal of the same case raise any question that could have been presented in the previous appeal on the then state of the record, as it existed in the court of original jurisdiction. If this were not so, any party to a suit could institute as many successive appeals as the fiction of his imagination could produce new reasons to assign as to why his side of the case should prevail, and the litigation would never terminate. Once this Court has ruled upon a question properly presented on an appeal, or, if the ruling be contrary to a question that could have been raised and argued in that appeal on the then state of the record, as aforesaid, such a ruling becomes the 'law of the case' and is binding on the litigants and courts alike, unless changed or modified after reargument, and neither the questions decided nor the ones that could have been raised and decided are available to be raised in a subsequent appeal.**

217 Md. at 371-72 (emphasis added).

In this appeal, the County argues that the law of the case doctrine does not apply because it is now challenging the "enforceability of the recent orders," not the "legally distinct issue[ ] . . . of the legal validity of the award itself." The County contends that the Court of Appeals never decided any issue related to enforceability. The County again contends that the nine questions it presented to this Court in its 2011 appeal "were never addressed by the Court of Special Appeals or the Court of Appeals." It claims the Court of Appeals's refusal to grant the County's request to remand the case to this Court for consideration of the nine questions it raised in its previous appeal "effectively denied the County's right of appeal which is guaranteed by Courts & Judicial Proceedings Article, § 12-301."[8] The County contends that the circuit court's application of the law of the case

_____

[8]Md. Code, Courts & Judicial Proceedings Article (1973, 2013 Repl. Vol.) ("CJP"), § 12-301 provides:

doctrine was "patently erroneous in light of the Court of Appeals holding in *Garner v. Archers Glen Partners, Inc.*, 405 Md. 43 (2008)." The County is incorrect, and its reliance on *Garner* is misplaced.

In *Garner*, a group of citizens filed a petition for judicial review in the Circuit Court for Prince George's County, contesting the approval, by the Prince George's County Planning Board, of a preliminary plan. The circuit court affirmed the Planning Board, and the citizens appealed to this Court. In an unreported opinion ("*Archers Glen I*"), this Court held that the Planning Board "failed to articulate sufficiently the findings in support of its conclusion that the Preliminary Plan conformed to the recommendations of the Master Plan." 405 Md. at 49. This Court vacated the circuit court's affirmance of the Planning Board and directed that the case be remanded to the Planning Board for further proceedings, but first, "[i]n an attempt to avoid the expense and delay of additional appeals," we offered for guidance *dicta* "discussing the potential legal effect to be accorded the General Plan in the subdivision process[.]" *Id*. at 52. On remand, the Planning Board again approved the Preliminary Plan, and the citizens again contested that approval by filing a petition for judicial review. When the circuit court considered the second petition for judicial review,

Except as provided in § 12-302 of this subtitle, a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law. In a criminal case, the defendant may appeal even though imposition or execution of sentence has been suspended. In a civil case, a plaintiff who has accepted a remittitur may cross-appeal from the final judgment.

60

it ordered the case remanded to the Planning Board for further fact-finding. The developer and the Planning Board appealed to this Court.

In this second appeal, we reversed the circuit court's remand order, and we filed a reported opinion. *Archers Glen Partners, Inc. v. Garner*, 176 Md. App. 292 (2007) ("*Archers Glen II*".) One of the arguments the citizens made in *Archers Glen II* was that this Court's discussion, in *dicta*, in *Archers Glen I* was "the law of the case," and therefore, "the recommendations of the General Plan were binding on the Planning Board in considering and acting on the Preliminary Plan." 405 Md. at 52. We held in *Archers Glen II* that the *dicta* in our earlier opinion was merely *dicta* that did not constitute the law of the case. The citizens appealed our decision in *Archers Glen II*, and the Court of Appeals affirmed, noting: "[I]t is clear that, in Maryland, dicta not adopted as a final determination may not serve as the binding law of the case." *Id*. at 57.

By contrast, in the instant case, the Court of Appeals's decision affirming the circuit court's grant of summary judgment in favor of FOP was not mere *dicta*. It was a final determination that FOP was entitled, as a matter of law, to the judgment to enforce the arbitration award. That decision necessarily embraced and resolved all of the issues that the County raised, as well as any other issues that were then available to raise, challenging the validity of the arbitration award.

In the previous appeal of this case, in its opinion ruling that the circuit court's order to enforce the arbitration award was affirmed, the Court of Appeals stated:

61

Thus, **the Circuit Court would be legally correct in granting summary judgment in FOP's favor,** if (1) it reviewed the arbitrator's findings under a proper standard of review and (2) **if FOP was entitled to judgment as a matter of law**.

As the arbitrability of FOP's grievance was a decision to be initially made by the arbitrator, that decision was subject to the same deferential standard of review as the arbitrator's findings on the merits. Thus, the Circuit Court needed to make sure that both the arbitrator's findings (1) that FOP's grievance was arbitrable and (2) that FOP was entitled to relief did not constitute a "palpable mistake of law or fact apparent on the face of the award or a mistake so gross as to work manifest injustice." *Prince George's Cnty. Educators' Ass'n*, 309 Md. at 105, 522 A.2d at 941 (quotation marks omitted). Because the Circuit Court was unsure what standard to apply in reviewing the arbitrator's arbitrability finding, the Circuit Court subjected that finding to both a deferential and non-deferential standard of review. As for the award itself, the court "awarded great deference" to the arbitrator's findings. Accordingly, **the Circuit Court applied a proper standard of review** in both instances.

We now look to the arbitrator's findings to determine whether the Circuit Court was legally correct in granting summary judgment in FOP's favor. The arbitrator began his opinion by acknowledging the County's argument about the supposedly preclusive effect of the MOU's expiration on the arbitrability of FOP's grievance. Relying on *Nolde*[9] and *Litton*[10], the arbitrator responded to the County's challenge by stating that "[t]he end of a labor contract, however, does not always signal the death of negotiated rights thereunder, including the right to have a dispute over that matter resolved through arbitration." The arbitrator then discussed *Nolde* and *Litton* for their vesting principles and concluded that "the ultimate question is whether the retiree rights at issue may be considered vested and thus capable of continuing enforcement."

In the arbitrator's view, the question of vesting "is answered directly by the unequivocal language of the MOUs: The statement that 'the health

---

[9] *Nolde Bros. v. Bakery & Confectionary Workers Union*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977).

[10] *Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991).

insurance subsidy in place at the time of retirement shall remain in effect until the retiree becomes eligible for Medicare' is subject to no interpretation other than that here proposed by the FOP." He continued, "[w]hen the parties bargained this language, they made a binding promise to retirees that the subsidy would remain at whatever level existed at their retirement. That is a vested right, and it was not, and could not be, changed by the [subsequent] negotiations...." The arbitrator concluded: "[o]fficers who retired on or after February 1, 1992 and before July 1, 2007 have a vested right to retain the health insurance split applicable to them as active officers at the time of their retirement."

**The County attacks the arbitrator's findings on several fronts.** In addition to arguing against the application of *Nolde* and *Litton* to this case, the County suggests that the "Arbitrator acknowledged, but did not address, the County's argument that all obligations under the Agreement expired, including both the healthcare obligations and the independent obligation to arbitrate." According to the County, this alleged failure to consider whether the arbitration clause had expired gives basis to vacate the arbitration award not only for a palpable mistake in law, but also for failure "to consider all matters submitted."

The County also argues that the healthcare subsidy was not a vested right. Here, the County asserts that "[t]here is no 'vested right' to future health insurance benefits and subsidies in the expired FY 2007 MOU, based on evidence, long-standing practice, and applicable law." In support of this statement, the County mentions the Labor Commissioner's testimony, where he stated that "there is no vested right to health insurance benefits and there never has been such a right in Baltimore County." The County also points out that "there is no statutory requirement that County employees be provided with health care benefits."

**The County's arguments are unavailing**. First, we agree with FOP that "as a corollary to his express findings that the right had vested, and as a necessary precondition to his granting the grievance, the arbitrator necessarily determined that the arbitration clause was enforceable and that the grievance was arbitrable." The arbitrator's consideration of the arbitrability of the dispute and the merits of the case illustrates the interconnectedness of these two issues in cases where arbitrability depends on the interpretation of the underlying agreement. Having found that the retirees were entitled to the health-insurance premium split in effect at the time of their retirement, the arbitrator necessarily

63

also found, by implication, that the arbitration clause survived the MOU's expiration, and the dispute was arbitrable. *See Nolde*, 430 U.S. at 249, 97 S.Ct. at 1071 ("[I]n determining the arbitrability of the dispute, the merits of the underlying claim for severance pay are not before us. However, it is clear that, whatever the outcome, the resolution of that claim hinges on the interpretation ultimately given the contract clause providing for severance pay."); *Litton*, 501 U.S. at 205–06, 111 S.Ct. at 2225 ("A postexpiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.").

Second, like the Circuit Court, we see no reason to disturb the arbitrator's finding of vesting. The County's arguments on the lack of county employees' statutory entitlement to health care based on Commissioner Gay's testimony simply miss the point. **The arbitrator found that the rights had vested based on his interpretation of the underlying MOU**, which stated that "the health insurance subsidy in place at the time of retirement shall remain in effect until the retiree becomes eligible for Medicare." **We do not think that the arbitrator's reading of this clause as a "binding promise" constituted a "manifest disregard of the law" or resulted in "manifest injustice."** *Prince George's Cnty. Educators' Ass'n*, 309 Md. at 105, 522 A.2d at 941. **On the contrary, we agree with the Circuit Court that the arbitrator's interpretation of this language was consistent with the objective theory of contract interpretation that Maryland adheres to, under which courts give primary effect to the terms of the agreement.** *Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700, 709 (2007).

**In any event, the arbitrator's findings are awarded a great deal of deference and should not be disturbed, unless the arbitrator demonstrates a "manifest disregard of the law ... beyond and different from a mere error in the law or failure on the part of the arbitrator[ ] to understand or apply the law."** *Prince George's Cnty. Educators' Ass'n*, 309 Md. at 102, 522 A.2d at 939. **Since we see no such mistakes here, we conclude that the Circuit Court correctly determined that FOP was entitled to judgment as a matter of law.** Thus, we reverse the judgment of the Court of Special Appeals.

429 Md. at 561-64 (emphasis added).

Plainly, the Court of Appeals affirmed the circuit court's conclusion that the grievance was arbitrable, which means that it necessarily agreed that the grievance was properly pursued by FOP on behalf of the retirees — despite the County's insistence that retirees are not employees entitled to bring a grievance —  and that the grievance was timely.  Summary judgment would not have been properly granted to FOP if it were otherwise.

Similarly, the Court of Appeals could have remanded, but did not remand, the case to this Court for further consideration of the "nine questions" the County raised in the 2011 appeal.  In a motion for reconsideration, the County expressly asked the Court of Appeals to remand for further consideration, and made the following arguments — a portion of which we quoted above — in support of the remand requests:

> Compounding its error in nullifying a negotiated agreement, the Court [of Appeals] either mistakenly or intentionally refused the County's request to remand this case to the [Court of Special Appeals] for consideration of the issues which the County had raised, but which were not addressed by that Court.  (See the issues listed in the [Court of Special Appeals's] Unreported Opinion at note 1, reproduced at Petitioner's App. 217-218).  Thus, the County has been denied the right of appeal which is guaranteed by Courts & Judicial Proceedings Article, § 12-301 from the final judgment entered by the Circuit Court for Baltimore County.
>
> The Court's decision to remand to the [Court of Special Appeals] "with directions to affirm the judgment of the Circuit Court for Baltimore County" is inconsistent with its many prior decisions remanding "to the intermediate appellate court for consideration of undecided issues."
>
> * * *
>
> Of great practical consequence to the County, there has been no review of the following issue which was raised by the County in its Brief in the [Court of Special Appeals]:

65

Contrary to law and public policy, the arbitrator's award usurps the power of the Baltimore County Executive and the Baltimore County Council to enact a budget which provides for health insurance and health insurance subsidies pursuant to the terms negotiated by the HCRC, FOP Lodge 4's bargaining agent.

**The Arbitrator in this case had no power or authority to order the County Executive and County Council to fund a split different from the negotiated split enacted into law as part of the FY 2008, 2009, 2010, 2011 and 2012 budgets, to order the County Executive and County Council to reset the split at 85/15 in any future budgets, or to "make whole" affected retirees for increased premium amounts not budgeted by the County Executive and County Council.**

If this Court's decision is allowed to stand, and this matter is remanded to the [Court of Special Appeals] with directions to affirm the judgment of the Circuit Court for Baltimore County, the Arbitrator's affirmed award will be unenforceable, since there have been no funds appropriated through the executive budget process to afford the relief capriciously dictated by the Arbitrator.

(Emphasis added.)

Notwithstanding these arguments, the Court of Appeals denied the County's motion for reconsideration, and left in place its order to affirm the judgment of the circuit court. "[O]nce an appellate court rules upon a question presented on appeal, litigants and lower courts become bound by the ruling, which is considered to be the law of the case." *Scott v. State*, 379 Md. 170, 183-84 (2004). As the Court of Appeals made plain in *Fid. Balt. Nat'l. Bank, supra*, 217 Md. at 372, "neither the questions decided [by the appellate courts] **nor the ones that could have been raised and decided** are available to be raised in a subsequent appeal." (Emphasis added.)

66

In the Court of Appeals's opinion in *Garner v. Archers Glen Partners*, *Inc., supra*, 405 Md. at 56, it quoted the following from *Turner v. Housing Auth. of Balt.*, 364 Md. 24, 34 (2001):

> It is well settled that the law of the case doctrine does not apply when one of three exceptional circumstances exists: the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision on the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.

But none of those "exceptional circumstances" is present here.

Moreover, the public policy arguments about enforceability that the County complains have never been addressed were, in fact, presented to and ruled on by the circuit court before the first round of appeals. In the circuit court's memorandum opinion and order granting summary judgment in favor of FOP, the court noted that one of the County's arguments was that "the Arbitrator had no authority to rewrite the FY 2008 MOU and order the County to reset the previous 85/15 split for the retirees in question." As noted above, the circuit court addressed the County's public policy arguments as follows:

> Lastly, the County contends that [the Arbitrator] exceeded his authority by effectively rewriting the health care subsidy provisions negotiated by the HCRC on behalf of the FOP for the FY 2008 MOU and by ordering the County to maintain the 85/15 subsidy split for officers that retired after February 1, 1992 and before July 1, 2007.
>
> Specifically, the County argues that [the Arbitrator] exceeded his authority as set forth [in] Section 8.3, Step 4 of the FY 2007 MOU. That section provides:
>
> > The arbitrator shall have no authority to add to, detract from, alter, amend or modify any provision of this Memorandum of

67

> Understanding or any rules or regulations of any agency of the County, or establish or alter any wage rate or wage structure.

The County further asserts that the Award was contrary to the Budgetary and Fiscal Procedures set forth in the Baltimore County Charter and the Baltimore County Code, which state the County Executive and County Council are responsible for enacting a budget and appropriating funds needed to run the County, including health care subsidies. [The Arbitrator's] Award, the County argues, usurped these powers by ordering the County to maintain and fund the 85/15 subsidy split.

The FOP counters that [the Arbitrator's] Award concerned only the interpretation and enforcement of compensation terms that were previously set, and as such, does not usurp either the legislative or executive power of the County. The FOP points to the distinction between grievance arbitration, which uses a neutral third party to resolve a dispute over the interpretation of an existing contract, and interest arbitration, which uses a neutral third party to set the terms of a new contract. Under the prevailing case law, argues the FOP, grievance arbitration does not involve the delegation of legislative authority because the arbitrator is acting in [a] judicial capacity rather than a legislative one. "The authority to interpret an existing contract, therefore, does not constitute legislative authority, and the nondelegation principle is not implicated in grievance arbitration." [*City & County of Denver v. Denver Firefighters Local No. 858*, 664 P.2d 1032, 1038 (Colo. 1983).]

The Court agrees with the FOP's position. The County and the FOP agreed to submit "any dispute concerning the application or interpretation of the terms of [the FY 2007] Memorandum of Understanding" to binding arbitration. The grievance submitted to [the Arbitrator] concerned the interpretation of Section 7.3(c), a contract term that had already existed and had been bargained for by the parties. In resolving the grievance, [the Arbitrator] did no more than what was required of him – to interpret the disputed contract language in accordance with the facts presented and applicable law. Therefore, the Court finds that [the Arbitrator] did not exceed his authority i[n] reaching his Award.

(Footnotes omitted.)

We are not persuaded by the County's argument that the law of the case doctrine should not apply because the public policy arguments it made previously went to the merits of the award, whereas the present arguments attack the enforceability of the award. The arbitrator's award expressly directed the County to take the actions the FOP asked the circuit court to compel in the motion to enforce. The award stated:

> The County is directed to rescind its modification, to reset the contribution split applicable to these officers to 85/15, to continue that split so long as, by the terms of the language, these officers remain eligible and to make whole affected retirees for increased premium amounts improperly charged to them since September 1, 2007.

The County was obligated to assert all of its arguments that might support vacating the award, including all of its arguments against enforcement of the award, during the first round of circuit court proceedings. When the Court of Appeals confirmed in 2012 that FOP was entitled to the grant of summary judgment in its favor, all of the public policy arguments the County had made, or could have made, about enforceability of the arbitration award were resolved against the County. Consequently, the arguments that the County makes on this appeal related to enforceability — including its questions presented 1, 2, and 3 — have already been conclusively resolved by the Court of Appeals's prior ruling in favor of FOP. We will not consider these questions further.

Similarly, the County's arguments about the timeliness of the initial grievance and the right of the retirees to file a grievance — appellant's questions presented 5 and 6 — have also already been conclusively resolved. The circuit court determined, as a predicate to its

69

August 17, 2010, grant of summary judgment in favor of FOP, that the grievance was timely filed and that the retirees had standing to pursue it. This finding was necessarily affirmed by the Court of Appeals's 2012 ruling affirming the grant of summary judgment in FOP's favor.

## II. The balance of the County's contentions on this appeal

Having held that the County's questions presented 1, 2, 3, 5, and 6 are not before us for review due to the law of the case doctrine, we turn now to the County's remaining contentions, which raise issues that arose for the first time after the remand.

First, in question 4, the County asks whether the show cause order's threat of incarceration was "an unconstitutional exercise of judicial power calculated to coerce an appropriation or illegal payments in violation of the separation of powers doctrine." Because the circuit court never ordered the incarceration of any County official, this issue is moot. *Suter v. Stuckey*, 402 Md. 211, 219 (2007) ("A case is moot when there is . . . no longer an effective remedy the Court could grant."). We decline to render an advisory opinion on the constitutional question.

Next, in question 7, the County asks whether the circuit court's "award of injunctive relief and damages to FOP was clearly erroneous, because FOP did not sustain any harm or damages as a result of the reduced subsidy rates." In support of its claim that the court erred, the County cites one case: *L.W. Wolfe Enterprises*, *Inc. v. Maryland National Golf, L.P.*, 165 Md. App. 339, 343 (2005). But *L.W. Wolfe* is a case about a mechanic's lien that a

70

subcontractor wanted to obtain against an entire golf course as a remedy for unpaid work the subcontractor did on certain cart paths at the golf course. The trial court found that the subcontractor was not entitled to the mechanic's lien on the entire property because the work it did on the cart paths was repair, not new construction. *L.W. Wolfe'*s applicability to the issues presented in the instant case is not readily apparent.

The circuit court action in this case began when the County filed a motion to vacate the arbitrator's award. That motion recited the basic facts, including that FOP filed a class grievance on September 14, 2007, complaining, on behalf of its affected members, about the altered subsidy split. The motion to vacate made numerous arguments, but never asserted that FOP lacked standing to pursue a grievance on behalf of its members. Moreover, the FOP's motion to enforce the arbitration award provided an adequate basis for the court to enter the order for payment of compensation contemplated by the arbitrator's ruling.

The County asks in question 8 whether the circuit court erred in refusing to allow its witnesses to testify, at the damages hearing, about their thoughts regarding whether there was any merit to the underlying grievance in the first instance, or whether certain appropriations had been made. The court sustained FOP's objections to these questions, and the County was allowed to proffer what its witnesses' answers would be, which were generally that the grievance was improper and the retirees FOP represents were not entitled to any relief. But a damages hearing was not an appropriate forum to relitigate the validity of the underlying award. Consequently, we perceive no error in the refusal of the court to permit the County's

71

witnesses to give irrelevant testimony. *See* Maryland Rule 5-402 ("Evidence that is not relevant is not admissible.")

Finally, in question 9, the County asks whether FOP was entitled to pre-judgment interest. The County argues that the circuit court erred in relying on the affidavit of Dr. Amy McCarthy, FOP's economist expert, and in entering an amended judgment that awarded pre-judgment interest. The County complains that Dr. McCarthy's affidavit was hearsay not within any exception, and that the court's post-hearing reliance on it prevented the County from cross-examining Dr. McCarthy. The County complains further that, in any event, FOP was not entitled to pre-judgment interest because "there is no entitlement to prejudgment interest on unliquidated claims." The County's arguments fail.

An unliquidated claim is "one, the amount of which has not been fixed by agreement or cannot be exactly determined by the application of rules of arithmetic or of law." 3 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 7:34 (4th ed. 2008). The County complains that the amount it owed the retirees in damages was unliquidated. But the County's own evidence proved otherwise. At issue was the County's liability, *vel non*, for its decision to discontinue the 85/15 subsidy split it had paid for retirees between 1992 and 2007. The higher amounts charged the retirees were specifically ascertainable amounts. Although the total amounts were not known by FOP, these amounts were readily quantifiable, and were not unliquidated. The arbitrator, the circuit court, and the Court of Appeals all found that the County had made a vested benefit agreement to

72

maintain an 85/15 subsidy split for a specifically identifiable group of retirees until each became eligible for Medicare. Once liability was determined, the amount of damages was readily ascertainable from the County's own records. It depended on four fixed, known numbers: the total premium cost of the insurance, the amount the County should have been charging the retirees (15%), the amount the County had charged the retirees post-September 1, 2007, and the difference between what the County should have been charging and what it had actually collected from those retirees. The County provided the spreadsheet showing all these numbers, and FOP's expert witness, Dr. McCarthy, explained the numbers to the court at the damages hearing. The court had previously determined that FOP was entitled to prejudgment interest; the principal amount on which that interest was to be calculated was ascertainable (but growing each month); and therefore the court was permitted to perform the ministerial task of determining the amount of prejudgment interest due without convening another hearing. In the absence of any suggestion — either in the circuit court or on appeal — that Dr. McCarthy's arithmetic was incorrect, we perceive no error in the circuit court's reliance upon her computations.

In *Blue Cross & Blue Shield of Maryland, Inc. v. Chestnut Lodge, Inc*., 81 Md. App. 149 (1989), this Court quoted with approval from *Affiliated Distillers Brands Corp. v. R.W.L. Wine & Liquor Co., Inc*., 213 Md. 509, 516 (1957) (citations omitted):

> The law in Maryland with reference to interest is well settled. The general rule is that interest should be left to the discretion of the jury, or the Court when sitting as a jury. However, this general rule is subject to certain exceptions that are as well established as the rule itself. Among the exceptions are cases on

73

bonds, or on contracts, to pay money on a day certain, and cases where the money has been used. If the contractual obligation be unilateral and is to pay a liquidated sum of money at a certain time, interest is almost universally allowed from the time when its payment was due.

Here, FOP's entitlement to prejudgment interest was clear. All that remained to be done was the math. In *Ali v. CIT Technology Financing Services, Inc.*, 188 Md. App. 269 (2009), we remanded a case because we could not discern, from the record, how the trial court arrived at its prejudgment interest award. We noted, however, that "we are unaware of any case requiring the trial judge to disclose its method of calculating prejudgment interest." *Id*. at 298. That is not an issue here. In this case, the County provided spreadsheets showing the subsidy amount being paid, the subsidy amount that should have been paid, what the retirees were actually charged, and the difference. Dr. McCarthy performed the arithmetic and testified at the damages hearing. The County cross-examined her at the hearing and questioned her at her deposition.

FOP points to a case from the United States Court of Appeals for the Fourth Circuit, *Kosnoski v. Howley*, 33 F.3d 376 (4th Cir. 1994), in support of its contention that the circuit court in this instance was permitted, without holding another hearing, to perform the task of computing the amount of already-awarded prejudgment interest, as such a computation would involve only plugging numbers into a formula, not revisiting the merits of the award itself. In its reply brief, the County cited no cases in opposition to this notion. We find the reasoning of the 4th Circuit in *Kosnoski* persuasive. There, Kosnoski, the owner of two companies, agreed with Howley that, if Howley found a buyer for his companies, Kosnoski

would pay Howley a finder's fee of 5%. Howley found a buyer, and Kosnoski paid the 5% finder's fee as to one of the companies he sold, but refused to pay Howley his finder's fee relative to the other company. Kosnoski sued Howley and sought to have their arrangement declared unenforceable under West Virginia law. Howley counterclaimed, seeking his 5% finder's fee on the second company. The United States District Court for the Southern District of West Virginia sided with Howley, and ordered Kosnoski to pay Howley the 5% finder's fee he was due, "plus any appropriate pre-judgment and post-judgment interest at the legal rate." *Id*. at 377.

Kosnoski appealed to the 4th Circuit, and lost. He then filed a motion for rehearing or rehearing *en banc*, which was denied. Kosnoski still refused to pay, and asserted that the District Court had not set the start date from which the interest would accrue. Howley filed a motion to fix interest, which Kosnoski argued was really a motion to alter or amend under Federal Rule of Civil Procedure 59(e). Because the motion had been filed more than ten days after the entry of judgment, Kosnoski argued it was untimely and had to be denied. Howley argued that it was not a motion to alter or amend because the District Court had already determined that he was entitled to prejudgment interest, and his motion merely asked the judge to do the math and set the amount. The District Court agreed with Howley.

Kosnoski again appealed, and the 4th Circuit again ordered him to pay Howley the prejudgment interest that was due. Pointing out that it had already been determined that

75

Howley was entitled to prejudgment interest, the 4th Circuit held that the District Court was permitted to fill in the blanks as to the precise amount due:

> [S]uch a court does not revisit the merits of the question [regarding entitlement *vel non* to prejudgment interest] and certainly does nothing that can be called "reconsidering" the matter. Instead, the court is asked to perform a completely ministerial task by plugging the time period, the interest rate and the judgment amount into a preset formula and announcing the result.
>
> The facts of this case demonstrate the ministerial nature of the court's responsibility: both parties understood that interest had been awarded; both parties understood that West Virginia law set the rate of prejudgment interest at ten percent; and both parties understood the time frame for computation. The court's only task was to do the calculation and make the amount official. We simply do not believe that by performing this function the court altered or amended the judgment. Rather, we are persuaded that the court, in undertaking such a task, merely supplies a figure to the judgment, the amount of which had already been fixed at the time of the entry of judgment. This omission is the type of error that is properly within the scope of [Fed.] Rule [Civ. Pro.] 60(a).[11]
>
> * * *
>
> The task required of the court was completely ministerial, and involved the mere application of a series of facts previously determined to a set formula in order to elucidate a part of the judgment order that, while providing notice to all as to their positions, was sufficiently inexact to allow Kosnoski to attempt not to comply.

*Id.* at 379.

---

[11] Federal Rule of Civil Procedure 60(a) states:

(a) **Corrections Based on Clerical Mistakes; Oversights and Omissions.** The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. . . .

The reasoning in *Kosnoski* applies with equal force here. A calculation of simple interest at the rate of 6% for pre-judgment interest — or 10% for post-judgment interest — on a fixed sum is a ministerial task and one for which the court did not need to convene a new hearing.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**